Argued and submitted December 19, 1997, affirmed June 10, 1998

# STATE OF OREGON,
*Appellant,*

*v.*

# MICHAEL JONATHAN POWELSON,
*Respondent.*

## (960332083; CA A93866)

961 P2d 869

Katherine H. Waldo, Assistant Attorney General, argued the cause for appellant. With her on the opening brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General. With her on the reply brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Jenny Cooke argued the cause and filed the brief for respondent.

Before De Muniz, Presiding Judge, and Deits, Chief Judge,* and Haselton, Judge.

DE MUNIZ, P. J.

---

* Deits, C. J., *vice* Rossman, S. J.

## DE MUNIZ, P. J.

Defendant was indicted for manufacture of a controlled substance (marijuana), delivery of a controlled substance (marijuana), possession of a controlled substance (marijuana) and possession of a controlled substance (cocaine). The state appeals a pretrial order granting defendant's motion to suppress. We affirm.

On February 12, 1996, Portland Police Officer Schmautz received information from a named informant that defendant had distributed marijuana in the past 72 hours and had admitted having a marijuana-growing operation in his house. Schmautz corroborated the information sufficiently so that he believed that he had probable cause to arrest defendant and to obtain a warrant to search defendant's home. Nonetheless, Schmautz chose not to get a warrant. Instead, accompanied by Agent Hess and dressed in plain clothes, Schmautz went to defendant's home for a "knock-and-talk,"[1] shortly before 10 p.m. Two other officers were with them but did not come to the door. Schmautz knocked on defendant's door, identified himself and Hess. Schmautz told defendant that they would like to speak with him, but Schmautz did not tell defendant that he was the object of the investigation.

Defendant let the officers in and led them to his kitchen, where he was cooking. Schmautz then explained that they had received information leading them to believe that defendant had marijuana growing inside his house. Schmautz testified that defendant began sweating when he heard the word "marijuana" and that he did not respond for two or three minutes. Schmautz testified that defendant then stated that he had read about police coming to people's homes and that he knew that he was not obligated to give them permission to go into his home or walk through his home. Schmautz "corroborated" that defendant's understanding was correct. The officers asked defendant if he wanted to give

---

[1] This record does not contain a concise description of "knock and talk," and a complete reading of the record does not reveal the exact operational parameters of "knock and talk." Accordingly, we do not attempt any kind of definition or description of "knock and talk" beyond what is revealed in this opinion.

them permission to search his home or whether he wanted them to get a warrant. More conversation followed, and Schmautz testified that he told defendant "several times" that defendant could ask the officers to leave his home and that they would do that. However, Schmautz admitted on cross-examination that, if defendant had asked him to get a search warrant, defendant would not have been free to leave while Schmautz obtained the warrant. Schmautz summarized his explanation to defendant of the options:

> "I think specifically what I said to him—and I never did tell him he was being detained, just to—if I understand the question you are asking, I never once said to him, 'You are being detained or under arrest or you are not free to leave.' I never said any of those things to [defendant] on this particular event. But when I said to him that 'I would detain you,' I think when you look at the context of the conversation, what I meant was that—he asked me, 'What would happen if I told you to go get a warrant?' I said, 'I will detain you until I finish the process of making application for a warrant.' Then I went [on] to tell him that I couldn't guarantee I could get one or not, but I would detain him during that time.

> "* * * * *

> "So what I meant was that I would—he would—the options he had are he could sit in his house with an officer. He could ask us all to leave, which we would do. Then he could come outside, or he could go—or he could sit in a holding cell. Those are all options of detention basically. He was not free to leave."

At some point the cover officers arrived at the door and defendant gave them permission to enter. However, he changed his mind and those officers went back outside. Meanwhile, defendant asked to speak to a lawyer, and Schmautz told him to "[g]o for it." Defendant made a call from the kitchen.[2] After hanging up, defendant told Schmautz and

---

[2] Schmautz offered defendant the use of his cellular phone. Schmautz offered to leave while defendant made the call but defendant did not ask him to. However, Schmautz explained:

"Q: Did you intend [defendant] to understand that if—that he would have to use the cellular phone because he couldn't use his own phone?

"[Schmautz]: Uhm, yeah, that probably would have been the way—I mean, I would not he [sic]—at that point, would have left his home and allowed him to

Hess that he was waiting for a return phone call.[3] When Schmautz encouraged defendant to try again to get in touch with an attorney, defendant said, "It really doesn't matter. Why don't we just go take a look around?" The officers had been in defendant's home about 20 or 25 minutes when defendant led the officers upstairs, where Schmautz again asked defendant if he wanted to permit the police to search. Defendant responded by asking again what his options were, and Schmautz gave defendant a written consent form. Defendant read the form and signed it. Defendant then opened the closet in a spare room, where the officers discovered a growing operation. He then led them to his bedroom where they found scales, packaged marijuana and cocaine.

Defendant testified that the officers told him that they wanted to walk through his house with his permission and that, if defendant told them there were areas they could not search, "they would be very curious" and would want to look in those areas and would get a search warrant. He testified that the officers told him that, if he asked them to get a search warrant, it would take two to three hours and that, during that time, an officer would remain in his house with him and that, when they returned if they found marijuana, he would go to jail. Defendant testified that he did not feel in control of his own home, that he was under the control of the officers, and that once the officers were inside his home he did not feel free to go or to tell the officers to leave. Defendant testified that he would not have consented to a search if he had not been informed that refusing would mean he would go to jail.

The trial court granted defendant's motion to suppress, finding, *inter alia*, that defendant was told that if he did not consent to the search, the police would get a warrant and either remain in defendant's home with him or take him to a holding cell. The court concluded that defendant would

---

just close the door and lock us out, because I believed I had probable cause to make application for a warrant. So I would have offered him to continue to have any conversations that he wanted, either at our office or in our truck or on his front porch or wherever he felt comfortable. I had no intention of taking him into custody, taking him to jail."

[3] Defendant testified that he had tried to call a friend. The trial court found that defendant had waived his right to an attorney.

not have consented to the search "if he knew that the police could not detain him" and that defendant's "free will was tainted."

The state assigns error to the court's granting of defendant's motion to suppress. The state's arguments are primarily grounded on its contention that, because the police were lawfully in defendant's home and "had probable cause to arrest defendant for a felony," no warrant was required:

> "Officer Schmautz's testimony was clear: police had probable cause to arrest defendant for manufacture of a controlled substance and police had probable cause sufficient to obtain a warrant to search the premises. Once Officer Schmautz had been admitted into the house by defendant, no constitutional provision prevented Officer Schmautz from 'seizing' defendant by arrest or otherwise detaining him. Officer Schmautz testified that if defendant asked police to get a warrant, Officer Schmautz did not intend to leave the premises without either taking defendant into custody and removing him from the house or, if defendant did not want to go to a holding cell and instead preferred to stay in the house during the application process, defendant could consent to police remaining in the home with him."

The difficulty with the state's position, however, is, as defendant points out, that the court made no finding that the police had probable cause to arrest defendant. In a reply brief, the state acknowledges that the order appealed did not make that finding or conclusion[4] but, pointing to two places in the record, the state contends that oral findings of probable cause were made. The state contends that defendant argued that he should be permitted to cross-examine the officer about the information that could have been presented in a warrant and that he has not assigned error to the trial court's denial of his requests. Therefore, the state contends, the court's oral findings remain unchallenged.

---

[4] An order granting defendant's motion was entered on June 19, 1996. The findings of fact and conclusions of law did not include anything about probable cause. Apparently defendant's attorney then left the country for several weeks during which time the state submitted a revised order which included a conclusion that the police had probable cause to believe that defendant had a marijuana-growing operation in his home. The trial court entered that order on July 9. On August 7, the trial court granted defendant's motion to vacate that revised order.

■     In the first instance, we do not agree with the state's reading of the record. In one reference on which the state relies, the court stated: "*[I]f* I make a finding that I would, in fact have issued a warrant * * *[.]*" (Emphasis supplied.) That is not a statement that the court would have done so. In the second instance, the context clearly shows that the court was referring to *Schmautz's* belief that he had probable cause.[5] Furthermore, we do not agree with the state that defendant is responsible for preserving any challenge to probable cause. At the suppression hearing, the state took the position that probable cause was not an issue before the court. For example, the prosecutor argued:

> "Objection, Your Honor [to defendant's inquiry of Schmautz as to what constituted probable cause]. I don't believe this is relevant at this time. The facts of this case — whether—what the probable cause was or what it wasn't is not relevant [to] what happened here. What happened here is he gave consent."

Later, in response to defendant's argument that he should be allowed to cross-examine Schmautz on probable cause, the prosecutor again stated: "The State's theory is this was a consent search, and that is why that line of questions isn't necessary." After the state made that argument, the court specifically stated that it was "not going to make [a] determination whether or not [Schmautz] had probable cause."

By framing the issue solely as one of consent, the state removed the issue of probable cause from the court's consideration, and, under these circumstances, defendant is not required to assign error to the court's failure to consider probable cause.

The state posits, however, that if "some question exists about the actual findings made by the court with respect to the existence of probable cause to arrest," this court should remand for further findings. However, because of the state's position at the hearing, there is no evidence

---

[5] The court stated:

"All I ruled was the officer had the right to make a representation that he could get a warrant. The magistrate would have given him a warrant."

from which findings can be made. Accordingly, we review the trial court's order on the theory presented below—whether or not defendant voluntarily consented to the search. *See State v. Martin*, 135 Or App 119, 123, 897 P2d 1187 (1995) (review should be on same theory that was presented to trial court).

As noted above, the trial court's holding was that defendant had allowed the officers into his home but that they had misrepresented their authority to detain him and that his free will was overborne by that misrepresentation. The state makes two arguments in challenging the court's ruling. The state's main argument is that the officers had probable cause to arrest defendant: "The trial court's conclusion that defendant would not have consented to the search had he known police could not detain him cannot have the legal effect of vitiating otherwise voluntary consent when police *did* have the authority to arrest him in his home." (Emphasis state's.) However, as we have discussed above, there was no finding of probable cause on which the state can rely to support the officers' actions.

■   The state alternatively argues that defendant voluntarily consented to the search. The state bears the burden of proving the voluntariness of defendant's consent. *State v. Paulson*, 313 Or 346, 351-52, 833 P2d 1278 (1992). The trial court held that defendant did not voluntarily consent because he was seized and his will overborne. The historical facts found by the trial court are binding on review, but whether defendant's consent was voluntary in a constitutional sense is for this court to determine. *State v. Stevens*, 311 Or 119, 135, 806 P2d 92 (1991).

A seizure does not necessarily occur when an officer tells a person that, unless a consent to search is given, the officer will seek a search warrant; that kind of coercion is constitutionally permissible because the law permits an officer to seek a warrant. *State v. Williamson*, 307 Or 621, 627, 772 P2d 404 (1989) (Carson, J., concurring). Here, however, the trial court found that the officers went beyond telling defendant that they would apply for a warrant, telling him instead that, if he did not consent, he would be taken to a holding cell

or an officer would remain at the house with him while a warrant was obtained. The issue, thus, is whether these actions constituted a seizure of defendant.

■ What constitutes a seizure of a person was recently discussed by the Supreme Court in *State v. Juarez-Godinez*, 326 Or 1, 942 P2d 772 (1997). The issue before the court was whether property had been seized for purposes of Article I, section 9, of the Oregon Constitution, and the court found instructive the analysis it had made in recent cases discussing the seizure of persons. It summarized those holdings:

> " '[I]nterference' with a person need not be accomplished by means of physical force, but may result from a mere show of authority. Our cases show, moreover, that a police officer has seized a person, for purposes of Article I, section 9, if that person *believes* that he or she has been seized and that belief is *objectively reasonable*. Finally, our seizure-of-person cases hold that any examination into whether an encounter between a police officer and a citizen constitutes a seizure is necessarily a 'fact-specific inquiry into the totality of the circumstances of the particular case.' " *Id.* at 6-7 (citations omitted; emphasis in original).

Applying that test, we agree with the trial court that the officers' actions here resulted in a seizure. Defendant believed that he was not "free" after the officers entered the house, and, under the circumstances, an objectively reasonable person would have believed the same. Although the state argues that the officers gave defendant a "choice," the only "choice" was the Hobson's choice of whether defendant would be held in a cell or watched in his house by police.

■ Although it does not necessarily follow from the seizure of defendant that his will was overborne, unlawful police conduct may render a subsequent consent involuntary when the illegality has an "effect on the state of mind of the person giving consent, affecting whether the consent is a voluntary act of that person's free will." *State v. Rodriguez*, 317 Or 27, 38, 854 P2d 399 (1993). The state argues that defendant let the police into his home, did not ask them to leave, knew that he did not have to consent to a search and signed a consent form. The state argues, thus, that the "totality of the circumstances" shows that defendant's consent was of his free will.

■      However, as noted above, although the officers informed defendant that he had the option not to consent, they also made it clear that if he failed to consent, he would be detained. The trial court held that that threat of detention "tainted" defendant's will. We agree with the trial court that the unlawful police conduct affected defendant's state of mind so that his consent was not a voluntary act of his free will. The trial court did not err in suppressing the evidence.

Affirmed.