Argued and submitted July 28, 1998, affirmed July 7, 1999

# STATE OF OREGON,
*Respondent,*

*v.*

# JOHN THOMAS RODAL,
*Appellant.*

## (C9610-37545; CA A96824)

985 P2d 863

Stephen A. Houze argued the cause and filed the brief for appellant.

Janet A. Klapstein, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Deits, Chief Judge, and Brewer, Judge.*

DEITS, C. J.

* Brewer, J., *vice* Riggs, P. J., resigned.

## DEITS, C. J.

Defendant appeals his conviction for manufacture of a controlled substance, ORS 475.992, following a trial to the court on stipulated facts. Defendant makes four assignments of error on appeal, all pertaining to the trial court's refusal to suppress evidence obtained as a result of aerial surveillance that located marijuana growing at defendant's residence and the subsequent investigative actions by the police. We affirm.

On September 9, 1996, Officer Royster, an Oregon State Police detective assigned to the Regional Organized Crime Narcotics Agency, flew over defendant's property in a National Guard helicopter during a surveillance flight conducted as part of an "outdoor marijuana eradication program" that was being undertaken in the area. Royster first flew over defendant's property at about 11:15 a.m. and spotted what he believed to be marijuana plants. Because there were shadows on the plants at that time, Royster flew over again that afternoon because, as he testified, "to call it absolutely positively, I want to have sun on it."

Royster has extensive experience spotting marijuana from aircraft. On September 9, he observed marijuana growing on a number of properties, in addition to defendant's. Royster testified that marijuana has a distinctive color, shape, and size, and that the only visual aid that he used to identify it on defendant's property was his eyeglasses. After spotting the marijuana on defendant's property, Royster photographed it from the air using "a 35mm [camera] with an 80 to 210 zoom lens." He testified that his purpose in taking the photos was to be able to clearly show the location to ground personnel who would go out to investigate and eradicate the marijuana.

After the aerial surveillance was completed and the photographs developed, Royster went over the results and his in-flight notes with Sergeant Martinek of the Multnomah County Special Investigations Unit. Royster drew a map to defendant's property, marked the location of the marijuana on the photographs, and informed Martinek that he estimated that approximately 20 plants were growing in the center of some blackberry bushes behind defendant's residence.

On the afternoon of September 10, Martinek, Officer Schrake, Deputy Walls and three National Guard personnel went to defendant's residence. They drove up the driveway, parked, and Martinek and Schrake walked toward the front door. While standing in defendant's driveway, at the end of the walkway to his front door, the officers looked toward the backyard, where the surveillance photos showed marijuana growing. They saw marijuana plants sticking out above the blackberry bushes. Martinek testified that the plants were located about 200 feet behind the house but that he could see the marijuana from where they were standing because he knew where to look from the photographs that he had seen of the property. After seeing the marijuana in the backyard, the officers continued to the front of the house and knocked. When no one answered the door, they returned to their vehicles. Martinek and Schrake remained at defendant's residence to prevent removal or destruction of the marijuana plants, while the other officers went to check other locations where marijuana had been seen. While they were waiting, Martinek and Schrake walked off the walkway that led to defendant's front door and went to the right side of the front of the house. They looked down the side of the house to see if they could see a pathway that they had noticed in the aerial photographs. There, they saw a trail along the side of the house, but they did not look further. No evidence was obtained from this observation.

When defendant returned home, a short time later, Martinek greeted him by telling him that they had seen marijuana plants in his backyard and that they would like his permission to search his residence and property for additional evidence. Defendant said that he did not know of any marijuana at all. Martinek then told defendant that they had sufficient evidence to get a search warrant, but that it would be easier for all concerned if defendant signed a consent-to-search form. Defendant gave oral consent to search and then signed the form. The officers gave defendant *Miranda* warnings after they went into the house.

After obtaining defendant's consent, and following the return of the other investigative personnel, the officers searched the house and the yard. In the backyard, behind a large compost pile, they discovered a tunnel, cut through the

dense blackberry bushes, leading to two groups of marijuana plants. In the house, they found a shotgun, a NORML[1] newsletter, two grow lights and several plant pots.

Defendant assigns error to the trial court's denial of his motion to suppress evidence obtained from the search of his house and yard. He first asserts that the use of a camera with a telephoto lens during the aerial surveillance constituted an unlawful search under Article I, section 9, of the Oregon Constitution.[2] Defendant makes three separate arguments under this assignment of error. First, he contends that Royster's use of a telephoto lens on the camera, with which he took the photographs of the marijuana plants on defendant's property, allowed Royster to make observations that he could not otherwise have made without the technological enhancement of the telephoto lens. Defendant contends that Royster's enhanced observations constituted a "search," and, because the observations were made without a search warrant and were not otherwise justifiable, they were made in violation of Article I, section 9, and must be suppressed.

■ Depending on the particular circumstances, the use of a technological enhancement by the police may or may not be sufficiently intrusive so as to violate protected privacy interests and, therefore, constitute a search for the purposes of Article I, section 9. *State v. Smith,* 327 Or 366, 374, 963 P2d 642 (1998) (holding that dog sniffs are not searches when conducted in a public place); *State v. Wacker,* 317 Or 419, 426 n 12, 856 P2d 1029 (1993) (stating that warrantless use of a technological enhancement is not a *per se* violation of Article I, section 9); *State v. Campbell,* 306 Or 157, 172-73, 759 P2d 1040 (1988) (holding that using a radio transmitter to follow defendant's car was a search); *State v. Louis,* 296 Or 57, 61, 672 P2d 708 (1983) (holding that photographs taken from a legal vantage point across the street, of the defendant exposing himself in his living room window, did not represent a search). It is unnecessary here, however, to determine if Royster's use of this particular technological enhancement

---

[1] National Organization for the Reform of Marijuana Laws.

[2] Article I, section 9, of the Oregon Constitution, provides, in part:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

was sufficiently intrusive so as to violate protected privacy interests because the trial court found that Royster positively identified the marijuana plants on defendant's property with no visual aids other than his eyeglasses *before* using the telephoto lens to document his discovery. The trial court concluded, and we agree, that here, as in *State v. Louis,* Royster took the photographs "merely [to] record[ ] what could be seen and had been seen without the camera[,]" 296 Or at 61, and to assist officers on the ground in locating what he had seen from the air. We are bound by the trial court's findings of fact if there is constitutionally sufficient evidence in the record to support them. *State v. Ehly,* 317 Or 66, 75, 854 P2d 421 (1993); *Ball v. Gladden,* 250 Or 485, 487-88, 443 P2d 621 (1968). We find that there is such evidence here.

■　Defendant's next argument under this assignment of error is that, in this case, the helicopter was used in such an intrusive manner that its use "significantly impaired" defendant's "interest in freedom from scrutiny." Defendant recognizes that, generally, as long as an aircraft is at a lawful vantage point, an aerial observation is not a search for purposes of Article I, section 9. *State v. Gohring,* 311 Or 33, 38-39, 803 P2d 1189 (1991); *State v. Ainsworth,* 310 Or 613, 801 P2d 749 (1990). In arguing that the use of the helicopter here was overly intrusive, defendant asserts that the helicopter flew over the property twice, that, according to defendant, the helicopter was flying at such a low altitude that it "disrupt[ed] his daily activities," that it was a military helicopter, and that it was part of a general marijuana eradication program.

■　There is no evidence here, however, that the helicopter was being operated in an unlawful manner; in particular, there was no evidence that it was flown in an area in which it was not allowed to be. Officer Royster testified that the helicopter did not go below 600 feet. The trial court found that there was nothing "inappropriate with the fly-over that happened in this case[.]" We conclude that the helicopter was not used in a manner that was sufficiently intrusive so as to impair defendant's freedom from scrutiny.

■　Defendant's final point under this assignment of error is that, because the photographs were used to pinpoint the location of the marijuana plants on defendant's property,

we must assess whether the use of the telephoto lens to take the photographs was an impermissible technological enhancement. The problem with defendant's argument, however, is that the record demonstrates that Royster's observations, which he made independently from the photographs and which he related to the other investigating officers, provided sufficient information for the officers to locate the marijuana plants. Royster testified that, after he had flown over defendant's property, he gave the other officers the undeveloped film and described what he had seen that day. He also gave them a hand-drawn map that showed the location of defendant's property and the location of the marijuana plants on defendant's property. While the photographs may have provided the police with more detailed information than was obtained from Royster's unaided visual observations, the additional information was not necessary to the police discovery of the marijuana. Consequently, we need not consider whether the use of the photographs taken with the telephoto lens was an impermissible technological enhancement. The aerial surveillance in this case was not a search.

■ Defendant's next assignment of error is that the trial court should have suppressed evidence "obtained during the initial police investigation at defendant's home." He argues that the officers exceeded the scope of implied consent when they walked past the front door of his house and looked down the right side of the house and also when they stood on the left side of the house and observed the tops of the marijuana plants growing over the blackberry bushes. He contends that these areas of his property were not intended for general public access.

With respect to the right side of the house, defendant does not argue that this conduct, which may well have unlawfully invaded a protected privacy or property interest, resulted in, produced, or led to the discovery of any evidence. Therefore, "there is no item of evidence * * * tainted by the potentially trespassory conduct and, therefore, no item to suppress." *State v. Sargent,* 323 Or 455, 462, 918 P2d 819 (1996).

With respect to the officers' observations from the left side of the house, the evidence shows that Officers

Martinek and Shrake stood in the driveway at the end of the cement walkway that leads to defendant's front door, looked to the left of defendant's house, and saw marijuana plants sticking up above some blackberry plants about 200 feet behind the house. Defendant argues that this area was not part of his driveway and was not on a direct route from the officers' vehicles to his front door. He asserts that the officers should have walked from where they had parked their vehicles in the driveway, straight across the lawn to reach the front door. However, as the trial court found, the area from which the officers made their observations was a logical route to defendant's front door. As the trial court found:

> "[I]t certainly would be more reasonable for a person to go in [the] direction [the officers went] * * * than walking across the lawn because a lot of people don't appreciate people driving up to the front of their house and just taking the shortest cut through the lawn. To go in an area that appears to be a walkway would be more reasonable. So the Court is not going to find any trespassing situations on [the left side of the house]."

As discussed above, the trial court's finding on this factual matter is supported by the evidence.

The critical legal question in this assignment of error is whether the officers' observations from the left side of the house were made from a lawful vantage point. *Ainsworth,* 310 Or at 621 (holding that "officer's unaided observation, purposive or not, from a lawful vantage point is not a search under Article I, section 9 * * *"). We conclude that they were. Although a person has privacy interests in the immediate area surrounding his or her residence, it is well established that social and legal norms presume that, in the absence of evidence of intent to exclude others, an occupant impliedly consents to allowing business or casual visitors to walk up to the front door and knock on it. *State v. Portrey,* 134 Or App 460, 465, 896 P2d 7 (1995); *State v. Ohling,* 70 Or App 249, 253, 688 P2d 1384, *rev den* 298 Or 334 (1984). As we explained in *Ohling*:

> "Going to the front door and knocking was not a trespass. Drivers who run out of gas, Girl Scouts selling cookies, and political candidates all go to front doors of residences on a more or less regular basis. Doing so is so common in this

society that, unless there are posted warnings, a fence, a moat filled with crocodiles, or other evidence of a desire to exclude casual visitors, the person living in the house has impliedly consented to the intrusion." 70 Or App at 253.

Here, the officers' observations were made from an area that defendant impliedly had consented to being used to approach his front door. As the trial court found, the configuration of the driveway and the walkway in front of the house led a visitor to believe that that was a logical approach to the front door. Defendant took no other action to show an intent to exclude visitors from that area. We hold that the officers were in a place where they had a lawful right to be when they saw marijuana plants in defendant's backyard. Accordingly, the officers' observations did not violate any interests protected by the constitution and their conduct was not a search.

■ In his third assignment of error, defendant challenges the propriety of the officers remaining in his driveway to await his return. In his brief, relying on *State v. Hanson*, 295 Or 78, 664 P2d 1095 (1983), defendant argues that this conduct constituted an unlawful seizure. However, as defendant acknowledged at oral argument before this court, the Oregon Supreme Court overruled *Hanson* in its decision in *State v. Smith*, 327 Or at 379. Under *Smith*, even if the officers' conduct was an unlawful seizure, because no evidence was obtained as a result of the seizure, it is unnecessary to suppress any evidence.

■■ Defendant's final assignment of error is that all evidence obtained pursuant to his consent to search his property should have been suppressed because his consent was involuntary. The state has the burden of proving "the voluntariness of [defendant's] consent to search * * * by a preponderance of the evidence." *State v. Stevens*, 311 Or 119, 137, 806 P2d 92 (1991). We will not disturb the trial court's findings of historical fact if evidence supports them. We are not bound, however, by the trial court's ultimate holding as to voluntariness, but we assess ourselves whether the facts meet constitutional standards. *Id.* at 135.

■ When defendant arrived home, Martinek told him that the officers were there about the marijuana on his property and that they had seen it growing in his backyard. Martinek testified that they told defendant that they had probable cause to obtain a search warrant. Defendant was advised that, if he consented to the search, it would be a quicker process and that, if no evidence of more serious crimes was found, he would not be arrested. Martinek told defendant that if he did not consent he would be detained while they obtained a search warrant. He was told that that process would take longer and that, if the search warrant was executed and marijuana was found, he would likely go to jail.

Defendant argues that, under these circumstances, he did not freely and voluntarily consent to the officers' request to search because he felt threatened by the officers. He argues that his consent was "mere acquiescence" in the search. He points to the officers' statements when he first arrived that they were "there about [his] marijuana" and that they wanted his cooperation. He also relies on the officers' statement that, if he did not consent to the search, they would get a warrant, would detain him while they waited for the warrant, and would arrest him after executing the warrant.

■ The trial court found that defendant was not coerced into giving his consent. The court explained:

"Then I think the Court need[s] to look at how the defendant responded to the situation with the officer. It does not appear to this Court that his will to resist their request for consent was overborne based upon his responses to the officers. When they asked him directly about the marijuana in back, he basically said what marijuana or what are you talking about.

"It wasn't a situation where he was so overborne, he just broke down and said oh, Officers, you got me, I got X number of plants growing back there. They are right back there.

"He said what are you talking about. He still had the wherewithal and the thought processes to say I don't know what you guys are talking about. So it doesn't come across as being overborne.

"We had two vehicles, two police vehicles out there. No guns, no guns drawn. Three officers. Its just—this Court does not find that's the type of coercive situation that would be overbearing in this type of situation."

In assessing voluntariness, we look at the totality of the circumstances to determine whether a defendant's consent was the product of the defendant's free will or was the result of express or implied coercion. *State v. Larson,* 141 Or App 186, 197, 917 P2d 519, *rev den* 324 Or 229 (1996). We agree with the trial court that the police conduct that defendant relies on here did not render his consent involuntary. " 'If the officers threaten only to do what the law permits them to do, the coercion that the threat may produce is not constitutionally objectionable.' " *State v. Williamson,* 307 Or 621, 627, 772 P2d 404 (1989) (Carson, J., concurring) (quoting *State v. Douglas,* 260 Or 60, 81, 488 P2d 1366 (1971) (O'Connell, C. J., dissenting on other grounds)); *State v. Hirsch,* 267 Or 613, 622, 518 P2d 649 (1974) (same). Here, the officers, having observed marijuana plants growing on defendant's property, had probable cause to seek and obtain a warrant. Further, the officers had both subjective and objective probable cause to arrest defendant for manufacturing a controlled substance. The officers' description of the actions that they planned to take described actions that they had authority to take. *Compare State v. Landers,* 101 Or App 293, 297-98, 790 P2d 1161, *rev den* 310 Or 205 (1990) (holding that it is not coercive to threaten actions that are authorized by the facts), *with State v. Powelson,* 154 Or App 266, 273-74, 961 P2d 869 (1998) (holding that unlawful seizure of defendant resulted in the tainting of his consent). Further, there was nothing otherwise coercive about these circumstances to render defendant's consent involuntary. We conclude that the actions that the officers threatened to take here were permissible and that defendant's consent was voluntary. The trial court did not err in denying defendant's motion to suppress.

Affirmed.