Argued and submitted June 16, reversed and remanded December 7, 2005

# STATE OF OREGON,
*Respondent,*

*v.*

# EDWIN SHANE COEN,
*Appellant.*

## 020774FE; A122232

125 P3d 761

Jesse Wm. Barton argued the cause and filed the brief for appellant.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Ortega* and Rosenblum,** Judges.

ROSENBLUM, J.

---

* Ortega, J., *vice* Ceniceros, S. J.
** Rosenblum, J., *vice* Linder, J.

**ROSENBLUM, J.**

Defendant appeals from a judgment of conviction for second-degree manslaughter, ORS 163.125, and driving while under the influence of intoxicants (DUII), ORS 813.010. He assigns error to the trial court's denial of his motion to suppress certain statements that he made to a police trooper and to its denial of his motion to suppress the results of a chemical analysis of his blood. We conclude that the trial court should have suppressed defendant's statements and the chemical analysis results because none of them was given voluntarily, and the trial court's admission of them was not harmless. We therefore reverse and remand.

We take the facts relevant to our analysis from the trial court's findings and the evidence at the suppression hearing. Because we will engage in a harmless error analysis, we also describe how certain challenged evidence was used at trial.

Oregon State Police Trooper Allison was dispatched to the scene of a car accident in which the driver of one car was killed and the driver of the other, defendant, was sent to the hospital. At the scene of the accident, the trooper inspected defendant's car and observed a "half rack" of beer on the floor of the front passenger side and a box of beer on the back seat. The trooper then went to the hospital to question defendant. When he arrived, the trooper spoke briefly to a doctor who stated that, in his opinion, defendant was intoxicated.

The trooper entered defendant's hospital room where defendant was lying face down on a gurney and wearing a cervical collar that restrained his head movement. The trooper observed that defendant's eyes were bloodshot, watery, and droopy, and that his speech was slow. Defendant appeared to be awake and alert. The trooper began questioning defendant about the accident without first informing him of his *Miranda* rights or telling him that he was free to end the interview.

In response to the trooper's questions, defendant said that he had been driving on the highway to Jacksonville and, as he came around a corner, suddenly there were lights

in his face. He said he was certain that he had remained in his lane. He also told the trooper that he had consumed three cans of beer in the two or three hours before the accident. The trooper then asked defendant to perform a horizontal gaze nystagmus test, but defendant had trouble with it due to the neck brace he was wearing.

The trooper next asked defendant if he would give blood and urine samples. Defendant said, "If I had a couple beers and this is turning into a big deal, I think that I should probably have an attorney, shouldn't I?" The trooper told defendant that that would be no problem and that it was defendant's prerogative, but also told him that if he called an attorney, he would be arrested. The trooper explained, "[T]here's actually two ways this is going to work, is, you can give it by consent, or I can place you under arrest and then I get it anyway." Defendant attempted to clarify his options by asking, "If I had a lawyer here, I'd be under arrest now?" The trooper responded affirmatively. Defendant asked, "But I'm not under arrest[?]" The trooper answered, "Well, right now you're not under arrest." Defendant then informed the trooper that he would consent to give the samples.

While they were waiting for a phlebotomist to take the samples, the trooper continued questioning defendant about the accident. He asked him if he could tell which lane the other driver was in. Defendant responded that he couldn't tell because the accident happened as soon as the other driver came around the corner. However, defendant appeared to retreat from his earlier statement that he (defendant, that is) had remained in his own lane. He stated, "He was on that corner, I tapered the corner, and then 'bam!' "

Defendant then expressed reluctance about giving the samples, stating that he was scared about giving them and concerned that they might incriminate him. He also repeatedly asked to talk with his mother, but the trooper ignored his requests. Defendant then gave the samples which, when subjected to chemical analysis, revealed a blood alcohol content of .25 percent.

Defendant was charged with DUII and with second-degree manslaughter. Before trial, defendant moved to suppress the results of the chemical analysis, as well as the

statements that he "tapered the corner," that he was afraid that the samples would incriminate him, and that he should probably have a lawyer. Defendant argued that he made the statements under compelling circumstances and was therefore entitled to *Miranda* warnings before being questioned. He asserted that, in the absence of such warnings, his statements were involuntary and must be suppressed under Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution.[1] The state responded that the hospital setting in which the statements were made was not sufficiently compelling as to require *Miranda* warnings. The trial court agreed with the state and refused to suppress the statements.

With respect to the results of the chemical analysis, defendant urged the court to suppress them under Article I, section 9, of the Oregon Constitution and under the Fourth Amendment to the United States Constitution.[2] He argued that taking the blood and urine samples constituted a search within the meaning of those provisions and was unconstitutional because it was done without a warrant and did not fall under any exception to the warrant requirement. Although defendant acknowledged consenting, he argued that his consent was involuntary because it was induced by an illegal threat, specifically, the trooper's threat to arrest defendant if he contacted a lawyer. Defendant argued that the threat was

---

[1] Article I, section 12, of the Oregon Constitution provides that "[n]o person shall be put in jeopardy twice for the same offen[s]e, nor be compelled in any criminal prosecution to testify against himself." The Fifth Amendment to the United States Constitution provides that "[n]o person shall * * * be compelled in any criminal case to be a witness against himself * * *."

[2] Article I, section 9, of the Oregon Constitution, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

illegal because the trooper lacked subjective probable cause to believe that defendant had been driving while under the influence of intoxicants and, therefore, could not have lawfully arrested defendant. In support of that argument, defendant relied on the trooper's testimony.

At the suppression hearing, the prosecutor asked the trooper whether, after seeing the beer cans in defendant's car, hearing the doctor say that he believed defendant was intoxicated, and observing defendant's bloodshot and watery eyes, he felt he had probable cause to arrest defendant for DUII. The trooper responded that he felt he had a "reasonable suspicion" that defendant had been driving while under the influence of intoxicants. Both the defense counsel and the trial court then noted that "reasonable suspicion" is different from "probable cause," but the trooper did not change his testimony in response.

The trial court found that "[the trooper] had a suspicion that the defendant was driving while impaired when he requested defendant's consent to take blood and urine samples" and that "[h]ad [the trooper] subjectively concluded that there was probable cause to arrest defendant after his refusal to give the samples, his conclusion would have been objectively reasonable under the circumstances." The trial court went on to conclude that defendant's consent to give his blood and urine for a chemical analysis was voluntary and denied the motion to suppress the results.

The statements were introduced into evidence at trial by playing a recording of the interview between the trooper and defendant. During closing arguments, the state highlighted that part of the recording in which defendant stated that he had "tapered the corner." Both the defense and the state had called accident reconstruction experts who disagreed about which car was more likely to have been in the wrong lane. During closing argument, the state asserted that the jury need not be confused by the experts because defendant himself had stated that he "tapered the corner." The state asserted, "But you have more than the accident reconstructionists. I mean, they're fantastic, they did a great job in this case, but you have more than that. What else do you have? You have defendant's own statement, 'I tapered the

corner.' " The state then argued that to "taper the corner" means to "cut the corner." Thus, the state urged the jury to rely on defendant's statement to find that he was the one who caused the accident.

The results of the chemical analysis of defendant's blood were also admitted into evidence at trial. Thereafter, defendant took the stand and admitted that he had been drinking before the accident. Specifically, defendant acknowledged that he had 15 or 16 beers in the eight hours before the accident. He testified that he has a high tolerance for alcohol and that he was not under the influence of intoxicants at the time of the accident, despite the amount of alcohol he had consumed. Defendant further testified that he had not acted recklessly by drinking before driving and that he had been in his lane and was not the cause of the accident. The state adduced additional evidence that defendant had been drinking before the accident and called several witnesses who testified that defendant appeared intoxicated immediately after the accident.

In instructing the jury on the DUII charge, the trial court told the jury that it could convict defendant based on his blood alcohol content, or on evidence that he was impaired, or both. The jury was instructed that the state must prove beyond a reasonable doubt that, "[w]hile driving the vehicle, [defendant] had a .08% percent or more by weight of alcohol in his blood as shown by chemical analysis of his breath or blood, *or* was under the influence of intoxicating liquor." (Emphasis added.) Another instruction advised the jury that it should consider evidence of the chemical analysis first. If the jury found that the analysis showed a .08 percent, or more, blood alcohol content, it should consider defendant under the influence of intoxicants. If the jury found that the analysis showed less than .08 percent, then the jury could go on to consider other evidence of the influence of intoxicants on defendant in reaching its verdict.[3]

---

[3] The jury was instructed:

"If you find, beyond a reasonable doubt, that the amount of alcohol in [defendant's] blood at the time [he] was driving a vehicle was equal to or greater than .08 percent by weight of alcohol as shown by chemical analysis of [defendant's] breath or blood, this constitutes under the influence of intoxicants. If you find the amount of alcohol in [defendant's] blood at the time [he] was driving a

The jury found defendant guilty of both DUII and second-degree manslaughter.

On appeal, defendant renews the arguments that he made to the trial court regarding suppression of the statements and the results of the chemical analysis. The state, likewise, renews its argument, and it additionally argues that any error in refusing to suppress the statements or the chemical analysis was harmless. We begin with defendant's challenge to the admission of his statements under Article I, section 12, of the Oregon Constitution. Under that section, the state must prove the voluntariness of defendant's statements by a preponderance of the evidence. *State v. Breazile*, 189 Or App 138, 142, 74 P3d 1099 (2003). In reviewing the trial court's decision, we are bound by its findings of historical fact if there is evidence in the record to support them, but we are not bound by the trial court's ultimate conclusion that defendant's statements were voluntary; we assess anew whether the facts suffice to meet the constitutional standard. *Id.* at 142-43.

Here, defendant argues that his statements were not voluntary because they were not preceded by *Miranda* warnings, which are required when a person is either in full custody or under compelling circumstances. *Id.*; *State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990) (*Miranda* warnings required in a setting " 'which judges would and officers should recognize to be "compelling" ' ") (quoting *State v. Magee*, 304 Or 261, 265, 744 P2d 250 (1987)). Defendant does not contend that he was in full custody when he made the statements, so we confine our inquiry to whether he gave the statements under "compelling circumstances."

Compelling circumstances exist when, taking into account the totality of the circumstances, a reasonable person in defendant's position would feel compelled to answer a police officer's questions. *See State v. Goree*, 151 Or App 621, 637, 950 P2d 919 (1997), *rev den*, 327 Or 123 (1998) (focus should be on whether "suspect reasonably will feel compelled

---

vehicle was less than .08 percent by weight of alcohol as shown by chemical analysis of his breath or blood, then you may consider this with any other evidence in this case to determine if [defendant] was driving under the influence of intoxicants."

to answer the questions of the police"); *State ex rel Juv. Dept. v. Loredo*, 125 Or App 390, 394, 865 P2d 1312 (1993) (whether circumstances were "compelling" depends on whether a reasonable person in the position of a person being questioned would have felt required to stay and answer all of the officer's questions). The totality of the circumstances includes both the setting of the questioning as well as the nature of the questioning—that is, " 'the extent to which the particular circumstances *of the questioning* create an environment in which the suspect reasonably will feel compelled to answer the questions of the police.' " *Breazile*, 189 Or App at 145 (quoting *Goree*, 151 Or App at 621) (emphasis in *Goree*).

We have previously examined whether the setting of a hospital room creates compelling circumstances and concluded that, by itself, it does not. *See State v. Warner*, 181 Or App 622, 47 P3d 497, *rev den*, 335 Or 42 (2002). In *Warner*, as in this case, the defendant was questioned while he was strapped to a gurney in a hospital room where he was being treated for injuries following a car accident. In considering the totality of the circumstances, we observed that (1) a hospital room is not a coercive environment; (2) although the defendant could not end the conversation by leaving the room, that fact alone was not dispositive because the defendant's immobility was not the product of police conduct but was due to medical reasons; and (3) there was no evidence in the record that defendant was coerced or pressured to answer the officer's questions, that his medical condition made him more vulnerable to questioning, or that the defendant wished to avoid talking to the officer. *Id*. at 629-30.

However, as noted above, the setting is not the end of our inquiry. Even where questioning takes place in a less-than-compelling setting, the nature of the questioning may render the circumstances compelling. *Breazile*, 189 Or App at 145 (stressing that the focus is not on the setting alone). In *Breazile*, the defendant was an inmate at a correctional institution who was questioned about marijuana that was found in his locker. He was asked to come to an office within the correctional facility where three correctional officers questioned him about the marijuana. *Id*. at 140. The defendant confessed that the marijuana was his and was later indicted for

possession of marijuana and supplying contraband. In opposing suppression, the state stressed that, although the defendant was incarcerated, he was not "in custody" for *Miranda* purposes because the interview was not the reason for his incarceration; the defendant had voluntarily come to the office for questioning. In addition, the state argued, the setting did not create compelling circumstances because there were no police officers present, only correctional officers who were investigating a disciplinary matter. *Id.* at 142.

We rejected the state's arguments, stressing that "the focus is not *on the setting alone*" but also on the nature of the questioning. *Id.* at 145 (internal quotation marks omitted; emphasis in original). Although the defendant had agreed to go to the office for questioning, it was undisputed that he could have been ordered to go or could have faced administrative sanctions for failing to do so. We stressed that the "[d]efendant understood that, had he refused to go, he would have been sanctioned." *Id.* at 147. We also stressed that, although the trial court had found that the defendant could have ended the interview at any time, there was no evidence in the record that the defendant knew that he was free to end the interview. We concluded that, under the totality of the circumstances, a reasonable person would have felt compelled to answer the correctional officers' questions.

In this case, although the circumstances in the hospital room were not initially "compelling," there came a point during the interview when the situation changed. The circumstances at the beginning of the interview resemble those in *Warner*. Defendant was confined in a hospital room and was being treated for injuries. Any restricted freedom was not the result of police conduct but, instead, was due to medical treatment. Likewise, when the trooper began questioning defendant, he readily agreed to talk about the accident. However, we conclude that, after the first few minutes of the interview—specifically, at the point where the trooper told defendant he would be arrested if he did not cooperate without the benefit of a lawyer's advice—the nature of the questioning created an environment in which a reasonable person would have felt compelled to answer the trooper's questions.

At that point, this case moved beyond the *Warner* scenario and became more like *Breazile*. Unlike in *Warner*, the record in this case indicates that defendant wished to avoid talking to the trooper without counsel and was pressured into answering his questions. Defendant repeatedly expressed his fear that he would incriminate himself if he cooperated and repeatedly asked to speak with his mother. Even more significantly, defendant told the trooper that he "should probably get a lawyer." The trooper responded by threatening to arrest him if he contacted a lawyer. Only then did defendant agree to continue the interview and to submit to blood and urine tests. As in *Breazile*, defendant's cooperation here was induced by his belief that he would be sanctioned—by being arrested—if he did not cooperate. We conclude that, under the totality of the circumstances, after the trooper told defendant that he would be arrested if he insisted on contacting a lawyer, a reasonable person in defendant's position would have felt compelled to answer the trooper's questions. *Miranda* warnings were therefore required and, because they were not given, defendant's statements given after that point should have been suppressed.

■ We further conclude that the admission of the statements at trial was not harmless with respect to the manslaughter conviction. Under Article VII (Amended), section 3, of the Oregon Constitution, we must affirm a conviction despite legal error during trial if the error was harmless. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). An error is considered harmless if there is little likelihood that the particular error affected the verdict. *Id.* In making that determination, we examine the record in light of the error at issue to determine its possible influence on the verdict rendered. *Id.* We recognize that, if the particular issue to which the error pertains has no relationship to the jury's determination, then there is little likelihood that the error affected the verdict. *Id.* However, in reviewing the record to determine whether an error was harmless, we will not sit as a factfinder and inquire whether we regard the evidence of guilt as substantial and compelling. *Id.*

In this case, defendant's statement that he "tapered the corner" was clearly prejudicial with regard to the manslaughter conviction. During closing arguments, the state

stressed that the jury need not detain itself with the competing expert testimony regarding causation and could instead rely on defendant's statement to conclude that he had crossed the center line and caused the accident. Given the state's heavy reliance on that piece of evidence, we cannot say that it had little likelihood of affecting the verdict. We therefore reverse and remand the manslaughter conviction.

We do not decide whether the statements were also prejudicial with regard to the DUII conviction because we conclude that defendant's second assignment of error provides grounds for reversal of the DUII conviction.

■    In his second assignment of error, defendant argues, among other things, that the results of the chemical analysis should have been suppressed under Article I, section 9, of the Oregon Constitution. Defendant asserts that, although he consented to give the blood and urine samples, his consent was the product of an illegal threat and was therefore involuntary. *See State v. Powelson*, 154 Or App 266, 274-75, 961 P2d 869 (1998) (where officers told the defendant that he could either consent to a search or be detained and threat to detain was unlawful, the defendant's ensuing consent was not voluntary). The state agrees that, if the trooper lacked *subjective* probable cause at the time he made the threat to arrest defendant, the threat would have been unlawful. The state also agrees that, if the threat was unlawful, then defendant's consent was involuntary and the chemical analysis should have been suppressed. We agree with the state's legal analysis. Our inquiry, then, comes down to whether the trooper subjectively believed that he had probable cause to arrest defendant at the time that he threatened to do so. We conclude that he did not.

■    Unlike a determination of objective probable cause, whether an officer subjectively believed that he had probable cause for an arrest is a question of fact. *State v. Bickford*, 157 Or App 386, 391, 970 P2d 234 (1998), *rev den*, 329 Or 589 (2000) ("[A] finding of subjective probable cause is a question of fact to be determined by the totality of the circumstances."). Accordingly, we are bound by the trial court's findings on the issue if there is evidence in the record to support them.

In this case, the trial court made written findings about the trooper's subjective belief at the time he threatened to arrest defendant. The state asserts that those findings do not constitute an explicit finding that the trooper lacked subjective probable cause to arrest defendant at the time that he made the threat. The state argues that, in the absence of explicit findings, we must assume that the trial court found that the trooper had subjective probable cause, because such a finding is necessary to support the court's ultimate denial of the motion to suppress. *See Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968) (appellate court "will presume that the facts were decided in a manner consistent with the [trial court's] ultimate conclusion").

We do not share the state's view of the trial court's findings. In our view, the only reasonable reading of its findings is that the trooper did not subjectively believe that he had probable cause to arrest defendant at the time he threatened to do so. The court found that "[h]ad [the trooper] subjectively concluded that there was probable cause to arrest defendant after his refusal to give the samples, his conclusion would have been objectively reasonable under the circumstances." The only plausible explanation for the trial court's phrasing is that it found that the trooper *had not* subjectively concluded that there was probable cause to arrest defendant. Moreover, the trial court found that, at the time the trooper threatened to arrest defendant, he had only a "suspicion" that defendant had committed DUII. As the court itself noted at the suppression hearing, "probable cause" is not the same as "reasonable suspicion." Accordingly, we conclude that the trial court found that the trooper lacked a subjective belief that he had probable cause for arrest.

We further conclude that the trial court's finding is supported by some evidence in the record. That evidence includes, primarily, the trooper's testimony that he believed he had a "reasonable suspicion" that defendant had committed DUII. Although the state points out that other evidence exists to support an inference that the trooper had changed his mind by the time he threatened to arrest defendant, that is not the pertinent issue. Rather, the pertinent issue is whether there is evidence to support the trial court's finding.

There is. Accordingly, we are bound by the trial court's finding that the trooper lacked a subjective belief that he had probable cause for arrest when he made the threat to arrest. It follows that the threat was unlawful and, further, that defendant's consent to give the samples was not given voluntarily and that the results of the chemical analysis should have been suppressed.

The state argues that the failure to suppress those results was harmless because defendant admitted to drinking 15 to 16 beers before the accident. We certainly agree that defendant's admission constitutes substantial and compelling evidence that he was driving while under the influence of intoxicants. However, as discussed above, the question in a harmless error analysis is not what we think about the evidence of guilt. Instead, it is whether, viewing the record in light of the asserted error, we can say that the error had little likelihood of affecting the verdict. The following two cases, involving facts similar to those here, illustrate the proper scope of our focus.

The first is *State v. Lyons*, 118 Or App 660, 848 P2d 1230 (1993). In that case, the defendant was convicted of DUII and, on appeal, challenged the admission of a breath test showing his blood alcohol content. The state argued that any error in admitting the breath test was harmless because the defendant had testified that he consumed five beers before the accident—as well as four ounces of Southern Comfort with a beer chaser after the accident but before police officers arrived—and had performed poorly on field sobriety tests. *Id.* at 664 n 4. We concluded that, although the state presented substantial evidence that the defendant was under the influence of intoxicants, the error was nevertheless prejudicial. We noted that the trial court had instructed the jury that it could find the defendant guilty of DUII if it found that, while driving the vehicle, the defendant either had a .08 percent blood alcohol content or was under the influence of intoxicating liquor—meaning that his physical or mental faculties were adversely affected to a noticeable or perceptible degree. We also noted that, because the jury returned a general verdict, we could not tell whether it convicted the defendant based on the inadmissable breath test, the admissible

other evidence of DUII, or a combination of both. We reasoned that, because the jury might have relied on the breath test, either by itself or in combination with other evidence, we could not say that its admission into evidence had little likelihood of affecting the verdict. *Id.* at 664.

In *State v. Snyder*, 187 Or App 648, 69 P3d 802 (2003), *rev'd in part on other grounds*, 337 Or 410, 97 P3d 1181 (2004), we concluded that a similar error, made under different circumstances, was harmless. In that case, the defendant was also convicted of DUII and challenged the admission of a chemical analysis showing his blood alcohol content. As in *Lyons*, the jury was instructed that it could convict the defendant of DUII either on the basis of his blood alcohol content or if it found that he was otherwise under the influence of intoxicants. However, unlike the defendant in *Lyons*, who admitted to drinking but not to being under the influence, the defendant in *Snyder* did not contest that he was under the influence; his defense was, rather, that he had not been driving. *Id.* at 650 n 1. Because the issue of the defendant's drinking and its effect upon him had not been contested before the jury, we concluded that the asserted error in admitting the test results had no relationship to the jury's determination of guilt and therefore had little likelihood of affecting the verdict. *Id.* at 657.

*Lyons* and *Snyder* illustrate the proper application of our harmless error analysis where a defendant in a DUII case challenges the admission of a chemical analysis revealing his blood alcohol content: Where the defendant does not challenge the required element of being under the influence of intoxicants, it is unlikely that erroneously introduced evidence of blood alcohol content affected the jury's verdict; where a defendant does contest that element and the jury instructions allow conviction based on blood alcohol content alone, such an error clearly has some likelihood of affecting the verdict.

This case falls into the latter category. Although defendant admitted to drinking 15 to 16 beers before the accident, he nevertheless contested the element of the offense requiring that he be found to have been *under the influence* of intoxicants, arguing that he has a high tolerance and was not

impaired while driving. The jury instructions here allowed the jury to convict solely on the basis of defendant's blood alcohol content, the evidence of which should have been suppressed.[4] Indeed, the instructions encouraged the jury to consider that evidence before—and to the exclusion of—any other. The jury may never have considered any of the properly admitted evidence because it was instructed, in essence, that the chemical analysis test results were sufficient for a conviction. We cannot, therefore, say that the admission of the results of the chemical analysis of defendant's blood had little likelihood of affecting the verdict. We therefore reverse and remand defendant's DUII conviction.

Reversed and remanded.

---

[4] We note that defendant's admission to drinking 15 to 16 beers before the accident is not relevant to whether his blood alcohol content exceeded .08 percent. Rather, under ORS 813.010(a), blood alcohol content must be demonstrated by "chemical analysis of the breath." *State v. O'Key*, 321 Or 285, 307-08, 899 P2d 663 (1995) (evidence that is not a chemical test under ORS 813.010(1)(a) is inadmissible to demonstrate that a defendant had a blood alcohol content of .08 percent or more).