Argued and submitted April 20, affirmed November 10, 1999

# STATE OF OREGON,
*Appellant,*

. *v.*

# HENRY GUZMAN,
*Respondent.*

## (C97-11-39013; CA A101178)

990 P2d 370

Douglas F. Zier, Assistant Attorney General, argued the cause for appellant. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Linda Friedman Ramirez argued the cause for respondent. Leslie Kay filed the brief.

Before Edmonds, Presiding Judge, and Deits, Chief Judge, and Armstrong, Judge.

EDMONDS, P. J.

Deits, C. J., dissenting.

## EDMONDS, P. J.

Defendant was charged with being a felon in possession of a firearm, ORS 166.270(1), and a felon in possession of a restricted weapon, ORS 166.270(2). The state appeals from an order granting defendant's motion to suppress evidence, including a switchblade knife and firearms seized from his residence.[1] ORS 138.060(3). We affirm.

At the hearing on the motion to suppress, Paula Oatley, defendant's probation officer, and Theresa Watson, defendant's roommate, testified. Defendant did not testify at the hearing. The trial court found that, in March 1994, defendant was on probation for crimes previously committed and that defendant signed a document that stated his conditions of probation.[2] Thereafter, defendant reported by mail as required by his probation officer. By 1996, a probation officer had requested the early termination of defendant's probation, but the record does not indicate the ultimate disposition of that request. Over a period of many months, the probation

---

[1] The motion to suppress requested that the court suppress "all physical and testimonial evidence seized as the result of a warrantless and otherwise unlawful search of a residence."

[2] That signed document included conditions of probation requiring defendant to: (1) "[i]f physically able, find and maintain gainful full-time employment"; (2) "[c]hange neither employment nor residence without prior permission from the Department of Corrections or a county community corrections agency"; (3) "[p]ermit the probation officer to visit the probationer or the probationer's residence or work site, and report as required and abide by the direction of the supervising officer"; (4) "[c]onsent to the search of person, vehicle or premises upon the request of a representative of the supervising officer if the supervising officer has reasonable grounds to believe that evidence of a violation will be found"; and (5) "[n]ot possess weapons, firearms or dangerous animals."

The quoted portions of defendant's conditions are substantively the same as several conditions provided in ORS 137.540(1). That statute provides, in part:

"(1) The court may sentence the defendant to probation, which shall be subject to the following general conditions unless specifically deleted by the court. The probationer shall:

"* * * * *

"(h) Permit the probation officer to visit the probationer or the probationer's residence or work site * * *.

"(i) Consent to the search of person, vehicle or premises upon the request of a representative of the supervising officer if the supervising officer has reasonable grounds to believe that evidence of a violation will be found * * *."

office charged with supervising defendant made nine unsuccessful attempts to visit defendant at his residence. Oatley testified that most of those attempts occurred during defendant's work hours. The trial court summarized its view of the evidence about defendant's performance on probation:

"[W]e don't find any evidence that defendant's committed any crimes or that he possessed any drugs, or that anybody's seen him involved in criminal activity, lots of people coming by his house, which would indicate drug traffic. Nobody has seen him bring a bunch of weapons into the place. He has worked. There's no evidence that he hasn't been working."

In 1997, Oatley assumed responsibility for the supervision of defendant. After Oatley sent defendant a letter requiring him to report to her office to review his probationary status, defendant reported to her as directed. Oatley testified that, during her meeting with defendant, she said,

" 'Well, I would like to go back to your residence. We'll drive you back with us and check your house, make sure you're living where you say you're living, and I would like to look around and make sure that you are not in violation in any way.' I pointed to the Court order and said, 'You know, you're not supposed to be drinking, you're not supposed to have any weapons, no drugs, nothing like that. That would all be indicative of violating the conditions. I want to make sure everything's okay. You're on for a pretty serious crime. And the fact that no one has actually caught you at the house at any time.' I want to make sure there's no further problems so we don't have any further problems that resulted in his getting on supervision in the first place."[3]

Oatley testified that defendant said in response, " 'Gee, I was wondering when you guys were going to come and visit me at my house.' " Oatley, defendant and another probation officer got into an automobile and drove to defendant's residence. Oatley was armed and wore a flak jacket.

---

[3] Oatley's incident report, admitted as an exhibit, indicates that she told defendant that she "would be conducting a home visit" and "would be looking for alcohol, drugs, guns, weapons and any other things that he was not supposed to have."

Oatley testified about her conversation with defendant that occurred as she transported defendant to his residence:

"Q. Can you tell us about the conversation on the way over to the house[?] Was it friendly, cordial, confrontational? How would you describe it?

"A. Extremely friendly. * * * and I asked again, 'Hey, it's no big deal. Just want to make sure you're living where you say you're living and, you know, nothing's—nothing's out of the ordinary.' And he said, 'Yeah. No problem. I have—I've been clean and sober for 17 years, and you know, there's just been no problem.' I said, 'Great. Then this won't take long and you can get on with what you're doing.'

"Q. Did he say it was okay for you to go into his house and look around?

"A. Several times."

After their arrival, Oatley and defendant entered his residence. Defendant's roomate, Watson was there. The trial court found that

"[defendant] told [Watson], 'They're going to look around.' All right? When he walked through the door he said, 'These are probation officers, they're going to look around.' "

Watson testified that

"[defendant] came in the house and the other two people were behind him. He explained that as part of his parole that they were going to come in and look around the house to make sure that everything was okay."

Eventually, Oatley requested that Watson and defendant sit down, and Oatley went into different parts of defendant's residence while the other probation officer stayed with Watson and defendant. As a result of her exploration, Oatley discovered weapons in defendant's bedroom that led to the charges in this case.

In characterizing Oatley's testimony about her statements to defendant, the trial court stated: "She told him from the time he came to her office all the way, 'We're going to go out to your house and look around.' " It also found Oatley's testimony not credible that, had defendant told her to leave,

she would not have taken him into custody but would have talked to him and left his residence. The trial court ruled that defendant knew that, if he did not consent to Oatley's activities, he risked probable arrest, but that defendant voluntarily consented to the search of his residence. Nonetheless, the trial court suppressed the evidence and ruled that, because the probation officer did not have reasonable grounds to believe that defendant was violating the conditions of his probation before she requested that defendant consent, she lacked authority to make the request.

On appeal, the state contends that defendant's probation officer had authority to search under ORS 137.540. Specifically, it argues:

> "Home visits, which were authorized by defendant's terms of probation, are routine. * * * It was unusual to be unable to contact defendant after so many attempts. * * * Another condition of defendant's probation required him to notify the authorities of his residence and not to move without prior approval. Due to the complete lack of success in finding defendant at his listed home address, Oatley had reasonable grounds to suspect that defendant did not in fact live where he claimed."

The state also asserts that the probation officer had general authority, apart from the probation conditions, to ask defendant for consent to the search of his residence and that defendant's consent to the search was otherwise voluntary.

■  We begin by examining the legal principles that govern the outcome of this case.

> "The general pattern of Oregon law is that a probationer is a free person possessed of all civil rights except those which are taken away from him for probationary purposes. Probation is a process of imposition of rehabilitative and protective conditions upon a convict in lieu of taking away his liberty by incarceration. * * *
>
> "ORS 137.275 provides that a convict does not lose any of his civil liberties solely by virtue of conviction. Upon conviction, however, ORS 137.540 gives to the court responsibility and authority to restrict or take away a probationer's liberties by imposing conditions of probation. * * * [T]he generality of ORS 137.540 indicates an intention to grant to

the court the broadest possible power to formulate appropriate conditions in each case. * * * ORS 137.630 * * * provide[s] that the probation officer must inform the probationer of the conditions of probation and, in the exercise of supervision and control, the officer is authorized to make such requirements and issue such orders as are suitable for the purposes of supervision and reformation.

"* * * Thus, read together, ORS 137.275, 137.540 and 137.630 * * * establish that a probationer retains all civil liberties except those which are taken away as conditions of probation * * *." *State v. Culbertson*, 29 Or App 363, 369-72, 563 P2d 1224 (1977) (footnotes omitted).

We turn first to the issue of whether the search of defendant's residence was authorized under the conditions of his probation. To the extent that the state is asserting that the search was justified under the home visit condition, our decision in *State v. Altman*, 97 Or App 462, 777 P2d 969 (1989), is instructive. In *Altman*, a mandatory condition of the defendant's probation, pursuant to ORS 137.540(1), was that he permit home visits by a probation officer. The defendant refused to permit probation officers to enter his residence, because defendant believed that they intended to search for marijuana and there was no probation condition requiring him to consent to the search of his residence. We said:

"[E]ven if one purpose of the visit might be to inquire about marijuana, [defendant] had no right to refuse to permit the visit. If the officers had sought his consent to search, he was not obligated to consent and, without his consent or a warrant, they would not have been permitted to search." *Id.* at 466.

The necessary implication from the reasoning in *Altman* is that the authority to conduct a home visit under the conditions of probation does not encompass the authority to conduct a search. The text of ORS 137.540(1) also supports this understanding, because the authority to conduct a home visit and the authority to conduct a search are the subjects of separate statutory provisions. That statutory scheme would be unnecessary if the authority to search were encompassed within the authority to conduct a home visit. Although a home visit reasonably could extend to the common areas of a

probationer's residence where visitors are customarily allowed, the authority to conduct a home visit does not carry with it the authority to inspect private areas of the residence. Thus, Oatley was not authorized to search defendant's residence under the home visit condition.

■    The state's next argument relies on the condition of defendant's probation that provides that he consent to a search of his residence when a probation officer has "reasonable grounds" to believe that he or she will find evidence of a violation.[4] Two cases, *State v. Hindman*, 125 Or App 434, 866 P2d 481 (1993), and *State v. Davis*, 133 Or App 467, 891 P2d 1373, *rev den* 321 Or 429 (1995), describe the effects of compliance or noncompliance with that kind of condition. In *Hindman*, we held that a condition requiring submission to a request to search a residence "was an agreement to consent to a search and not a prospective consent." 125 Or App at 439.[5] The significance of that difference is that a probationer's later refusal to consent does not constitute a consent but serves as a violation of his agreement to consent.

In *Davis*, the defendant's federal probation conditions included a condition requiring him to submit to unannounced home visits and a condition requiring him to submit to reasonable, warrantless searches and seizures by his probation officer. While making an unannounced home visit, the probation officer smelled marijuana as well as saw a fresh marijuana bud. The probation officer asked for a "tour" of the

---

[1] " '[R]easonable grounds' means a quantum of evidence, less than probable cause, that produces a belief in the probation officer, which belief is reasonable in the circumstances, that the probationer has violated a condition of probation and that a search will produce evidence of that violation." *State v. Gulley*, 324 Or 57, 65-66, 921 P2d 396 (1996) (interpreting ORS 137.540(2)(m) (1991)); *see State v. Meier*, 145 Or App 179, 929 P2d 1052 (1996) (applying the definition of "reasonable grounds" from *Gulley* to ORS 144.350(1), a statute currently providing for the arrest of an individual who is "then under the supervision or control of the department or other supervisory authority upon being informed and having reasonable grounds to believe that such person has violated the conditions of parole, postprison supervision, probation, conditional pardon or other conditional release from custody").

[3] *See also Meier*, 145 Or App at 182-86 (applying *Hindman* and concluding that a warrantless search, occurring after the defendant refused to give consent and was arrested, was not authorized by the consent condition of the defendant's parole that required the defendant to "consent to a search of his person, vehicle or premises upon reasonable grounds to believe evidence of a parole violation would be found").

defendant's apartment. The defendant stated, " 'You got me,' " and led the probation officer to a marijuana-growing operation in his bedroom. *Davis*, 133 Or App at 469. After the probation officer left the apartment, he contacted the police. The probation officer and the police officer returned to the defendant's apartment. The police officer told the defendant that he was there at the request of the probation officer to remove the marijuana. The probation officer then led the police officer to the bedroom. The defendant remained in the living room and did not object to the officers' activities. After viewing the operation, the officers returned to the defendant and eventually requested permission to conduct a thorough search of the defendant's bedroom. The defendant refused that request. The police officer seized the growing operation, but no additional searches were conducted.

In addressing the issue of whether "defendant's failure to expressly consent to or refuse the search denied [the probation officer] the authority to conduct a search under the probation condition," *id.* at 473, we reasoned:

> "Because the search condition does not constitute a waiver of the probationer's Article I, section 9, rights, the probationer is entitled to refuse to allow the search, and must be given a reasonable opportunity to do so. This is so even if the language of the condition does not specifically require that the probationer be *asked* to submit to a search." *Id.* at 474 (emphasis in original).

Ultimately, we held that, under the specific circumstances of that case, the defendant's conduct in response to the officers' actions constituted consent.

■ Here, when Oatley first said that she wanted to look around defendant's residence, she knew that attempts to conduct home visits had been unsuccessful. However, the record indicates that most of the attempts to contact defendant at his residence were during his work hours. Additionally, Oatley had sent a letter to defendant's listed address that directed him to report to her office, and defendant had responded as directed. The record also indicates that defendant had been reporting by mail as required and that, in

early 1996, his probation officer had requested early termination of defendant's probation. In sum, there was no evidence at that time to believe that defendant was in violation of the condition of his probation. Even if defendant had consented to a search of his residence by Oatley under the condition of his probation, that search was not predicated on a reasonable belief that defendant was in violation of his probation. Accordingly, the state cannot rely on that condition of probation as the basis of a lawful search.

■■    Because defendant's conditions of probation do not authorize Oatley's search, we must determine whether defendant voluntarily consented to the search apart from his conditions of probation. Consent is an exception to the general rule that warrantless searches are *per se* unreasonable. *State v. Beylund*, 158 Or App 410, 413, 976 P2d 1141, *rev den* 328 Or 594 (1999). The state has the burden of proving by a preponderance of the evidence that consent is voluntary. *Id.* at 414. In determining whether a defendant's consent is voluntary, we examine "whether, in the light of the totality of the circumstances, defendant's consent was a product of his own free will or was the result of coercion, express or implied." *State v. Charlesworth/Parks*, 151 Or App 100, 114, 951 P2d 153 (1997), *rev den* 327 Or 82 (1998). "In reviewing the voluntariness of a defendant's consent to search, we will not disturb the trial court's findings of historical fact if they are supported by the evidence. The determination [of] whether consent was voluntary is a legal issue that we review independently." *Id.* at 113.

■■    Mere acquiescence in police authority does not constitute a voluntary consent to search. *Davis*, 133 Or App at 474. In *State v. Freund*, 102 Or App 647, 796 P2d 656 (1990), a police officer told the defendant that he was there to pick up the marijuana that she was growing and that he wanted to do it calmly and efficiently. We held that "defendant was likely to conclude that [her] choice merely was between cooperating or not cooperating with a search that was bound to occur." *Id.* at 652. *Freund* stands for the proposition that a defendant does not voluntarily consent to a search if the defendant is not given a reasonable opportunity to make a choice to consent or if the defendant is informed that the search is going to occur, regardless of the failure to consent.

Here, Oatley testified:

> " '* * * I would like to look around and make sure that you are not in violation in any way.' I pointed to the Court order and said, 'You know, you're not supposed to be drinking, you're not supposed to have any weapons, no drugs, nothing like that. That would all be indicative of violating the conditions. I want to make sure everything's okay. You're on for a pretty serious crime. * * *' I want to make sure there's no further problems so we don't have any further problems that resulted in his getting on supervision in the first place."

In addition, the trial court expressly found not credible Oatley's testimony that, had defendant told her to leave, she would not have taken him into custody but would have talked to him and left his residence.

■    On these facts, we conclude that the state has not carried its burden of proof regarding voluntariness. *See State v. Courson*, 98 Or App 576, 580, 779 P2d 628 (1989) (holding that, under the circumstances of that case, where the "defendant simply felt that he had no choice but to comply with the search request[,] * * * the state failed to carry its burden to prove that [the] defendant's consent was a product of his free will"). The consistent thread in the evidence is that Oatley intended to conduct a search of defendant's residence because of the lack of contact with him by her office. As the trial court observed, from the time of the initial contact with defendant in her office to when she was in defendant's residence, Oatley conveyed her intention that she was going to conduct a search of defendant's residence to ascertain whether he was in compliance with the conditions of probation. Any consent was coerced by the possibility that defendant would be arrested for a violation of his probation if he did not cooperate. Defendant is not unlike the defendant in *Freund* who had no reasonable opportunity to choose to consent to a search when the police told her that they were there to pick up the marijuana.

The dissent concludes otherwise. It relies, in part, on the trial court's "finding" that defendant voluntarily consented to the search at Oatley's office.

■■■ The complete finding on the issue by the trial court was:

> "[Defendant's probation officer, Oatley,] wrote the defendant a letter and said, 'Come in, I want to see you. Nobody has seen you.' And he came in on time at 4:30. She chatted with him and said, 'You know, no one has seen you for a long time. *We need to go over to your house and take a look around. So have a seat here because we've got to go and check you out.* Do you still live at 8601 North Hamlin?' 'Yes,' he said yes. 'And how did you get here? Did you drive a car?' He says, 'No.' *She said, 'Well, we'll drive our car and you can go with us, and we'll go and take a look—and look around your house.' He says, 'Fine. Okay.'*
>
> "And she put him in the back, which I can understand that. And of course she had on her weapon, she had on her flak jacket. But that's not coercion, that's normal. And your client is familiar with the situation, based on his history with the government. So I don't think it's coercion just by having on your guns and protective jacket. I think I have a * * * that indicates that even a most honorable person is not really coerced just by the sight of a weapon on an officer. You need a little more than that, than what we have. The guns were not pointed, they were not drawn, there were no threats here." (Emphasis added.)

Under *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993), we are bound by the trial court's findings of historical fact if there is constitutionally sufficient evidence to support them. If a trial court does not make findings "on all pertinent issues and there is evidence from which such facts could be decided more than one way, we will presume that" the trial court decided the facts consistent with its ultimate conclusion. *Id.* We make our own determination of law based on those findings. *Id.*

In our assessment of whether the state has carried its burden of proof, we have based our conclusion only on findings of the trial court that are supported by the evidence. There is insufficient evidence to support the trial court's finding that defendant consented to the search at Oatley's office, and the dissent errs in relying on that finding to arrive at its conclusion that defendant's consent was voluntary. By the time that defendant purportedly consented to the search

while in the car, Oatley had already informed him that the search was going to occur.

The dissent also asserts that we erred

"in concluding that defendant's consent was not voluntary, because it gives too much weight to the fact that defendant was on probation and to the assumption that defendant's 'consent was coerced by the possibility that [he] would be arrested for a violation of his probation if he did not cooperate.' While that is a fact that should be considered as part of the 'totality of the circumstances,' it is not determinative under all circumstances. Anytime that a person is asked to consent to a search, the person is faced with the possible consequences of that decision. In some cases, the consequence is to wait with the police while a search warrant is obtained, *see State v. Rodal*, 161 Or App 232, 241-42, 985 P2d 863 (1999), while in others, it is the revocation of his or her probation or parole, *see Davis*, 133 Or App 467. The mere fact that there are adverse consequences to giving or refusing consent does not automatically destroy a person's ability to voluntarily give consent. If it did, any consent that resulted in the. evidence of a crime would be invalidated because of the coercive possibility that it could result in arrest.

"In particular, if we take the majority's reasoning to its logical conclusion, it would be impossible for a probation officer, even with the reasonable grounds required by ORS 137.540(1), to carry out a search of a probationer's person, vehicle, or premises." 164 Or App at 106 (bracketed material in original).

What the dissent misses is that the state has not proven that Oatley acted lawfully. This case is analogous to a situation in which a law enforcement officer stops an individual on the street, asks for permission to search and also indicates that he or she can obtain a warrant when the officer has no actual grounds to obtain the warrant. The representation is that the search will occur whether the consent is given or not. Under those circumstances, the officer is using the force of the law illegally to overcome the individual's will and to coerce consent to search. Here, Oatley had no authority to request consent under the probation conditions. In effect, the trial court found that Oatley represented to defendant that a

search was going to occur because he was under her authority as a probationer. That finding is supported by the evidence.

Article I, section 9, of the Oregon Constitution, and ORS 137.540 do not authorize probation officers to exploit their supervisory authority over probationers unlawfully. Their authority is circumscribed by the conditions of probation and the governing constitutional provisions. Under those circumstances, we cannot conclude that the state has met its burden of proving that defendant's consent was voluntary. Accordingly, we affirm the trial court's decision granting defendant's motion to suppress.

Affirmed.

**DEITS, C. J.,** dissenting.

I agree with the majority that the authority of a probation officer to conduct a home visit, pursuant to ORS 137.540(1), does not encompass the authority to conduct a search of the probationer's residence. I also agree that defendant's probation officer here did not have "reasonable grounds" to believe that she would find evidence of a probation violation. I would hold, however, that a probation officer has general authority to request a probationer's consent to a search of his or her residence. Consequently, as the majority recognizes, the critical issue in this case becomes whether defendant's consent was voluntary. 164 Or App at 99. In contrast to the majority, I would hold that defendant's consent was voluntary and that, therefore, the trial court erred in granting the motion to suppress.

In assessing the voluntariness of a defendant's consent to a search, we look at the totality of the circumstances to determine whether the consent was the product of defendant's free will or was the result of express or implied coercion. *E.g., State v. Parker,* 317 Or 225, 230, 855 P2d 636 (1993). We will not disturb the trial court's findings of historical fact, but whether consent was voluntary is a legal issue that we review independently. *State v. Charlesworth / Parks,* 151 Or App 100, 113, 951 P2d 153 (1997), *rev den* 327 Or 82 (1998).

Here, the trial court found that:

> "[Defendant's probation officer, Oatley,] wrote the defendant a letter and said, 'Come in, I want to see you. Nobody has seen you.' And he came in on time at 4:30. She chatted with him and said, 'You know, no one has seen you for a long time. We need to go over to your house and take a look around. So have a seat here because we've got to go and check you out. Do you still live at 8601 North Hamlin?' 'Yes,' he said yes. 'And how did you get here? Did you drive a car?' He says, 'No.' She said 'Well, we'll drive our car and you can go with us, and we'll go and take a look—and look around your house.' He says, 'Fine. Okay.'
>
> "And she put him in the back, which I can understand that. And of course she had on her weapon, she had on her flak jacket. *But that's not coercion*, that's normal. And your client is familiar with the situation, based on his history with the government. *So I don't think it's coercion* just by having on your guns and protective jacket. I think I have a \* \* \* that indicates that even a most honorable person *is not really coerced* just by the sight of a weapon on an officer. You need a little more than that, than what we have. The guns were not pointed, they were not drawn, *there were no threats here*."[1] (Emphasis added.)

Based on those findings, the trial court concluded that defendant's consent to search his residence was voluntary. However, the court then went on to hold that defendant's probation officer, Oatley, had no authority to request defendant's consent to search except under the terms of the probation agreement, which required that there be reasonable grounds to believe that a probation violation had occurred before consent could be requested. Consequently, because the trial court concluded that Oatley did not have reasonable grounds to believe that a probation violation had occurred, the court granted defendant's motion to suppress the evidence obtained in the search.

---

[1] The majority argues that its conclusions are based "only on findings of the trial court that are supported by the evidence" and the conclusions of the dissent are based on findings that are not so supported. 164 Or App at 101. I disagree. While the trial court's summary of the testimony before it may not have been verbatim, the court's factual findings are supported by substantial evidence.

In my view, the trial court erred in concluding that defendant's probation officer could not request consent to search except under the terms of the probation agreement. Generally, a peace officer has authority to request consent to search without reasonable suspicion that any offense has occurred. *See State v. Mesa,* 110 Or App 261, 265, 822 P2d 143 (1991), *rev den* 313 Or 211 (1992) ("No justification is necessary for an officer to ask for consent."); *State v. Auer,* 90 Or App 459, 464, 752 P2d 1250 (1988) (reasonable suspicion is not a prerequisite to asking for consent to search). There is no reason why a probationer should be entitled to greater protection than an ordinary citizen. *See State v. Gulley,* 324 Or 57, 65, 921 P2d 396 (1996). Further, there is no existing authority that compels the conclusion that a probation officer's ability to ask for consent to search should be limited. Of course, there is a difference in the effect of a probationer's refusal to consent to a search, which depends on whether the probation officer has reasonable grounds to believe that a violation will be found. If the probation officer has such grounds, then the probationer's refusal will constitute a violation of probation; whereas, if the probation officer requests consent to search without reasonable grounds to believe a probation violation has occurred, then the probationer may refuse and there are no consequences for that refusal. *See State v. Davis,* 133 Or App 467, 891 P2d 1373, *rev den* 321 Or 429 (1995) (refusal of request for consent based on conditions of probation is a violation of the condition); *State v. Hindman,* 125 Or App 434, 439, 866 P2d 481 (1993) (same).

The trial court found that defendant told his probation officer that she could look around the house. The majority does not dispute that, but concludes that defendant's consent was not voluntary. I disagree. The majority explains its conclusion as follows:

"As the trial court observed, from the time of the initial contact with defendant in her office to when she was in defendant's residence, Oatley conveyed her intention that she was going to conduct a search of defendant's residence to ascertain whether he was in compliance with the conditions of probation. *Any consent was coerced by the possibility that defendant would be arrested for a violation of his probation*

*if he did not cooperate.* Defendant is not unlike the defendant in *Freund* who had *no reasonable opportunity to choose to consent* to a search when the police told her that they were there to pick up the marijuana." 164 Or App at 100 (emphasis added).

I believe that the majority errs in concluding that defendant's consent was not voluntary, because it gives too much weight to the fact that defendant was on probation and to the assumption that defendant's "consent was coerced by the possibility that [he] would be arrested for a violation of his probation if he did not cooperate." While that is a fact that should be considered as part of the "totality of the circumstances," it is not determinative under all circumstances. Anytime that a person is asked to consent to a search, the person is faced with the possible consequences of that decision. In some cases, the consequence is to wait with the police while a search warrant is obtained, *see State v. Rodal,* 161 Or App 232, 241-42, 985 P2d 863 (1999), while in others, it is the revocation of his or her probation or parole, *see Davis,* 133 Or App 467. The mere fact that there are adverse consequences to giving or refusing consent does not automatically destroy a person's ability to voluntarily give consent. If it did, then any consent that resulted in the evidence of a crime would be invalidated because of the coercive possibility that it could result in arrest.

In particular, if we take the majority's reasoning to its logical conclusion, then it would be impossible for a probation officer, even with the reasonable grounds required by ORS 137.540(1), to carry out a search of a probationer's person, vehicle, or premises.[2] The conditions of probation do not provide consent to search but, rather, the promise to consent when a request to search supported by reasonable grounds is made. *Hindman,* 125 Or App at 439. A possible result, in the

---

[2] ORS 137.540(1) provides, in part:

"The court may sentence the defendant to probation, which shall be subject to the following general conditions unless specifically deleted by the court. The probationer shall:

"* * * * *

"(i) Consent to the search of person, vehicle or premises upon the request of a representative of the supervising officer if the supervising officer has reasonable grounds to believe that evidence of a violation will be found * * *."

event that the requested consent is refused, is revocation of probation. Under the majority's reasoning, therefore, even if consent is given, it would be invalid because it would be a result of the coercive "possibility of arrest for violating the conditions of parole." That cannot be right. In fact, in *Davis*, we recognized that, in the absence of evidence of other coercive circumstances, the threat that refusing consent will violate the defendant's conditions of probation is not in itself coercive enough to invalidate a defendant's consent to a search. We held the search in *Davis* valid because "[o]ther than the pressure on defendant not to violate the terms of his probation, there was nothing coercive about the circumstances."[3] 133 Or App at 476.

The other basis supporting the majority's conclusion that defendant's consent was not voluntary was that defendant had no reasonable opportunity to refuse consent. That finding, however, is inconsistent with the trial court's finding that Oatley did not threaten or coerce defendant. There is no evidence in this record that Oatley threatened defendant in any way, nor is there evidence that she told him that he was required to submit to a search. Rather, Oatley described her conversations with defendant as "extremely friendly" and said that defendant told her several times it was okay for her to go into his house and look around, and, although defendant's roommate, Watson, testified that she herself felt "very intimidated," she also testified that defendant did not look nervous and that he was not getting pushed around. At no time, during the interview in Oatley's office, during the ride to his house, or after arriving at the house, did defendant

---

[3] In *Davis*, the defendant's probation officer had reasonable grounds to request a search of the defendant's home. The question we were asked to decide was whether the defendant's mere acquiescence in the search, which for "an ordinary citizen * * * does not constitute voluntary consent[,]" constituted valid consent in view of "the ongoing supervisory relationship between the probation officer and the probationer[.]" 133 Or App at 474-75. We held that it did.

The majority cites *Davis* in support of the principle that "[m]ere acquiescence to police authority does not constitute a voluntary consent to search." 164 Or App at 99. In *Davis*, we held that "generally, an ordinary citizen's 'mere acquiescence' to police authority does not constitute voluntary consent to search." 133 Or App at 474. We went on to hold, however, that "under some circumstances, a probationer's acquiescence to a search by the probation officer may constitute consent." *Id.* at 475.

express any doubts or concerns about allowing Oatley to search his home.

I agree with the trial court that defendant did have the opportunity to refuse consent. I would hold that, after considering the totality of the circumstances here, that defendant's consent was voluntary. Accordingly, the trial court erred in allowing the motion to suppress. For all of the above reasons, I respectfully dissent.