Submitted November 24, 2015, affirmed February 1, 2017

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

LINDSEY MARIE SCOTT,
*Defendant-Appellant.*

Washington County Circuit Court
C130545CR; A156426

388 P3d 1148

Peter Gartlan, Chief Defender, and Ernest G. Lannet, Chief Deputy Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Doug M. Petrina, Assistant Attorney General, filed the brief for respondent.

Before Sercombe, Presiding Judge, and Tookey, Judge, and Garrett, Judge.

## GARRETT, J.

Defendant appeals a judgment of conviction for two counts of unlawful delivery of methamphetamine, ORS 475.890, and one count of unlawful possession of methamphetamine, ORS 475.894. In her first assignment of error, defendant challenges the trial court's failure to merge her guilty verdicts for delivery (Count 1) and possession (Count 2) into a single conviction for delivery under ORS 161.067(1). Defendant also assigns error to the trial court's imposition of a general condition of probation requiring defendant to permit a probation officer to conduct home visits pursuant to ORS 137.540(1)(h),[1] contending that the condition is unlawful under both the state and federal constitutions. For the reasons explained below, we conclude that the trial court did not err in either respect and, accordingly, we affirm.

The facts pertinent to this appeal are few and undisputed. Police executed a search warrant on defendant's residence, finding 13.2 grams of methamphetamine, packaging materials, a scale, $383 in cash and records of drug transactions. Based on that evidence, defendant was charged by indictment with, among other things, one count of delivery of methamphetamine (Count 1) and one count of possession of methamphetamine (Count 2). Both counts alleged additional facts—commonly referred to as "subcategory factors"—to elevate the crime seriousness of the charged offenses pursuant to ORS 475.900. *See State v. Baker*, 265 Or App 500, 503, 336 P3d 547 (2014) ("The state may allege subcategory factors to elevate the charged offense on the crime-seriousness scale for purposes of the felony sentencing

---

[1] At the time that defendant was sentenced in 2014, the home-visit condition was set out in ORS 137.540(1)(i) (2013). In 2015, the legislature renumbered that statute so that the condition now appears in paragraph (1)(h). *See* Or Laws 2015, ch 350, § 2. Unless stated otherwise, throughout this opinion we refer to the current version of ORS 137.540, which provides, in part:

"(1) The court may sentence the defendant to probation subject to the following general conditions unless specifically deleted by the court. The probationer shall:

"* * * * *

"(h) Permit the parole and probation officer to visit the probationer or the probationer's work site or residence and to conduct a walk-through of the common areas and of the rooms in the residence occupied by or under the control of the probationer."

guidelines." (Internal quotation marks omitted.)); *see also* ORS 132.557 (requiring the state to plead "any subcategory fact on which the state intends to rely to enhance the crime for sentencing purposes"). The indictment alleged that each offense was a "commercial drug offense," ORS 475.900(1)(b), and involved "substantial quantities" of a controlled substance, ORS 475.900(1)(a). Specifically, and as pertinent to this appeal, the indictment states:

> "The state further alleges that the above described offense involved substantial quantities of a controlled substance, consisting of 10 grams of a mixture or substance containing a detectable amount of methamphetamine, methamphetamine salts, isomers, or salts of isomers.
>
> "The state further alleges that the above-described offense was a commercial drug offense in that it was accompanied by at least three of the following factors:
>
> "* * * * *
>
> "4.  Defendant was in possession of more than 8 grams of a mixture or substance containing a detectable amount of methamphetamine."

Defendant agreed to a stipulated-facts trial, at the conclusion of which the court found defendant guilty on both counts.[2] Additionally, the court found that each count constituted both a commercial drug offense and involved substantial quantities of methamphetamine. The effect of that finding was to elevate the crime-seriousness rating of both offenses to an eight under the sentencing guidelines.

At sentencing, the trial court entered separate convictions on Counts 1 and 2, rejecting defendant's argument that the guilty verdicts on those counts should merge into a single conviction for delivery. The trial court sentenced defendant to five years' probation subject to all of the general conditions of probation found in ORS 137.540(1), including that defendant "[p]ermit the parole and probation officer to visit the probationer or the probationer's work site or residence and to conduct a walk-through of the common areas

---

[2] Defendant also pleaded guilty to, and was convicted of, unlawful delivery of methamphetamine in Count 3. On appeal, defendant does not challenge her conviction on that count.

and of the rooms in the residence occupied by or under the control of the probationer." ORS 137.540(1)(h). Defendant timely appealed, assigning error to the imposition of that probation condition as well as the trial court's failure to merge the guilty verdicts on Counts 1 and 2.

We begin with defendant's merger argument. Merger is governed by ORS 161.067, which provides, in part:

"(1) When the same conduct or criminal episode violates two or more statutory provisions and each provision requires proof of an element that the others do not, there are as many separately punishable offenses as there are separate statutory violations."

Under our case law, that provision *requires* merger when "a defendant's acts constitute the same conduct or criminal episode, violate two or more statutory provisions, and all the elements of one offense are necessarily included in the commission of the other offense." *State v. Flores*, 259 Or App 141, 144, 313 P3d 378 (2013), *rev den*, 354 Or 735 (2014); *see also State v. Blake*, 348 Or 95, 99, 228 P3d 560 (2010) ("[I]f one offense contains X elements, and another offense contains X+1 elements, the former offense does not contain an element that is not also found in the latter offense [and] * * * there is only one separately punishable offense."). In determining whether convictions must merge, we look to the statutory elements of each offense rather than the factual details set out in the indictment. *State v. Fujimoto*, 266 Or App 353, 357, 338 P3d 180 (2014). In this case, the parties' merger dispute turns on whether all of the elements of the crime of possession of methamphetamine (ORS 475.894) are subsumed within the crime of delivery of methamphetamine (ORS 475.890).

Defendant was found guilty of violating ORS 475.890, which provides that it is "unlawful for any person to deliver methamphetamine," and ORS 475.894, which provides that it is "unlawful for any person knowingly or intentionally to possess methamphetamine." Defendant acknowledges that, ordinarily, possession and delivery drug offenses do not merge. *See State v. Sargent*, 110 Or App 194, 198, 822 P2d 726 (1991) (holding that "possession and delivery do not

merge as a matter of law, because it is possible to commit the crime of delivery without having a possessory interest in the controlled substance"). Defendant nevertheless contends that they must merge in this case because, as charged, *both* crimes required the state to prove that defendant possessed eight grams of methamphetamine to meet the definition of a "commercial drug offense." *See* ORS 475.900(1)(b)(K)(iii) (specifying that, in order to be considered as one of the three commercial drug offense factors, an offender must possess "[e]ight grams or more of a mixture or substance containing a detectable amount of methamphetamine"); ORS 475.900(4) (requiring the state to plead and prove commercial drug offense factors beyond a reasonable doubt). Stated another way, defendant argues that, because the delivery charge alleged that defendant *actually possessed* methamphetamine (in addition to delivering it), the crime of possession is subsumed within the elements of delivery as charged in this case. Thus, defendant contends that the indictment did not allege anything in Count 2 (possession) that it did not also allege in Count 1 (delivery), and, therefore, the trial court was required to merge the two counts into a single conviction for delivery of methamphetamine.

Defendant's merger argument presupposes that the alleged subcategory factors for each of the charged offenses are, functionally, elements of those offenses. That premise, however, is contrary to our decision in *State v. Wright*, 150 Or App 159, 163, 945 P2d 1083 (1997), *rev den*, 326 Or 390 (1998), where we held that subcategory factors alleged in the indictment did not preclude merger of multiple offenses that, in the absence of those subcategory allegations, would merge into a single conviction. In that case, the defendant was charged with two counts each of delivery, possession, and manufacturing of a controlled substance. *Id.* at 161. Each pair of counts alleged additional subcategory factors— substantial quantity of a controlled substance and commercial drug offense—such that each count was differentiated from the other only by "additional facts in support of an offense-subcategory" (*i.e.*, one delivery count included facts alleging that the offense involved a substantial quantity of a controlled substance, and the other delivery count alleged that it was a commercial drug offense). *Id.* The trial court

found the defendant guilty and entered separate convictions on all counts. *Id.* On appeal, the defendant argued that each pair of convictions should merge, resulting in one conviction each for manufacturing, delivery, and possession of a controlled substance. *Id.* at 161-62. We agreed, concluding that, although each pair alleged different subcategory factors, the elements of the charged offenses in those pairs were identical because "the facts alleged in support of the offense-subcategories are not elements of the offense." *Id.* at 163. Thus, we held that the trial court erred by failing to merge the guilty verdicts on the paired counts.

Subsequently, in *Baker*, we applied that reasoning to conclude that, "[i]f subcategory allegations do not *preclude* merger of otherwise identical counts, it follows that such allegations also should not *lead to* the merger of multiple offenses that would not merge absent those allegations." *Baker*, 265 Or App at 505 (first emphasis added, second emphasis in original) (concluding that the trial court did not err by declining to merge the guilt determinations for second-degree burglary and first-degree theft into a single conviction under ORS 161.067(1)).

Our decisions in *Wright* and *Baker* are dispositive of the merger issue in this case: Because subcategory factors that are required to be pleaded for sentencing purposes are not elements of the charged offense, and because possession and delivery do not merge as a matter of law, the guilty verdicts on Counts 1 and 2 do not merge into a single conviction.[3]

In urging a contrary conclusion, defendant cites other cases that are distinguishable. Defendant relies primarily on our decision in *Flores*, where we held that guilty verdicts for "unlawful use of a weapon with a firearm" (UUW-firearm) and "felon in possession of a firearm with a firearm" (FIP-firearm) must merge because the "with a firearm" provision—which may be added to the title of any felony offense to create an aggravated crime—is an element of

---

[3] Defendant does not explain why, in light of our conclusion in *Wright* that a defendant can be convicted of both delivery *and* possession of a controlled substance, her guilty verdicts for delivery and possession should merge into a single conviction in this case.

both crimes with which the defendant was charged. 259 Or App at 147-48. In doing so, we rejected the state's argument that the "with a firearm" provision is merely a "sentence-enhancement fact" and, consequently, not an element of the crime that it enhances. *Id.* at 146. Our conclusion in that case, however, was compelled by the terms of ORS 161.610(2), the "with a firearm" statute, which unambiguously provides that "[t]he use or threatened use of a firearm * * * by a defendant during the commission of a felony may be pleaded in the accusatory instrument and proved at trial as *an element* in aggravation of the crime." (Emphasis added.) By contrast, ORS 475.900—the statute that sets out the subcategory factors at issue in this case—provides only that proof of certain additional facts will result in a higher crime-seriousness classification for sentencing purposes, not the creation of a separate *element* or crime.[4] Accordingly, we conclude that the trial court did not err when it failed to merge the guilty verdicts for delivery and possession of methamphetamine on Counts 1 and 2.

We turn to defendant's second assignment of error, in which defendant contends that the trial court erred by imposing a general condition of probation that requires probationers to "[p]ermit the parole and probation officer to visit the probationer or the probationer's work site or residence and to conduct a walk-through of the common areas and of

---

[4] Defendant's arguments under the Oregon Supreme Court's decision in *State v. Wedge*, 293 Or 598, 652 P2d 773 (1982), are similarly unavailing. In that case, the issue was whether a defendant's *right to a jury trial* was violated when the court, rather than the jury, found as fact that the defendant had violated an earlier version of ORS 161.610, which mandated a minimum five-year sentence for the use or threatened use of a firearm during the commission of a crime. At the time *Wedge* was decided, subsection (2)—which designates the use of a firearm as an element of an offense—had not yet been enacted. The court concluded in *Wedge* that, "[a]lthough the challenged statute is denominated an enhanced penalty statute, in effect it creates a new crime," requiring a jury determination as to that element under Article I, section 11, of the Oregon Constitution. 293 Or at 608. The holding in *Wedge* does not assist defendant here, in light of clearly established law that subcategory factors are not elements for purposes of the merger analysis. *See, e.g., State v. Unger,* 276 Or App 445, 450, 368 P3d 37 (2016); *State v. Travalini,* 215 Or App 226, 232-33, 168 P3d 1159 (2007), *rev den,* 344 Or 110 (2008); *State v. Dominguez-Coronado,* 215 Or App 7, 12, 168 P3d 291 (2007); *State v. Merrill,* 135 Or App 408, 899 P2d 712 (1995), *rev dismissed as improvidently allowed,* 323 Or 73 (1996). *See also Baker,* 265 Or App at 503 ("We do not understand why factors that relate only to sentencing should affect whether multiple offenses merge into a single *conviction.*" (Emphasis in original.)).

the rooms in the residence occupied by or under the control of the probationer." ORS 137.540(1)(h). Defendant points out that, unlike the condition set out in ORS 137.540(i), which requires a probationer to agree to "[c]onsent to the search of person, vehicle or premises upon the request of a representative of the supervising officer if the supervising officer has *reasonable grounds to believe that evidence of a violation will be found*," the home-visit condition does not contain any requirement that visits be supported by any level of suspicion or reasonable grounds to believe that a violation has occurred. (Emphasis added.) Defendant argues that the home-visit condition effectively authorizes suspicionless searches and is thus facially unconstitutional under both the state and federal constitutions.

The state responds that the condition is reasonable because probationers have significantly reduced privacy rights, and are routinely subject to restrictions that could not lawfully be imposed on members of the general public.[5]

---

[5] The state also contends that a "properly confined" home visit is not a search within the meaning of Article I, section 9, of the Oregon Constitution, or the Fourth Amendment to the United States Constitution. The state's position finds some support in our decision in *State v. Guzman*, 164 Or App 90, 96, 990 P2d 370 (1999), *rev den*, 331 Or 191 (2000), where we concluded that "the authority to conduct a home visit under the conditions of probation does not encompass the authority to conduct a search." In *Guzman*, we observed that the authority to conduct a home visit and the authority to conduct a search are the subjects of separate statutory provisions in ORS 137.540, a statutory scheme that would have been "unnecessary if the authority to search were encompassed within the authority to conduct a home visit." *Id.*

Although the two probation conditions are still currently set out in separate paragraphs, *Guzman* was decided under the then-extant version of ORS 137.540(1)(h), which provided only that a probationer was required to "[p]ermit the probation officer to visit the probationer or the probationer's residence or work site ***." *Id.* at 92 n 2. In 2001, ORS 137.540(h) was amended, in pertinent part, to add the following language: "to conduct a walk-through of the common areas and of the rooms in the residence occupied by or under the control of the probationer." Or Laws 2001, ch 726. In light of that added language, the validity of our conclusion in *Guzman* that a condition permitting home visits is wholly distinct from a condition permitting searches of a probationer's residence is unsettled. *See Guzman*, 164 Or App at 97 (explaining that a home visit "does not carry with it the authority to inspect private areas of the residence"). *But see State v. Brock*, 254 Or App 273, 277, 295 P3d 89 (2012) (observing that, "[u]nder Article I, section 9, a probation condition requiring a probationer to consent to a home visit is not the same as a consent to search; the latter is more intrusive and is conditioned on the existence of 'reasonable grounds to believe that evidence of a violation will be found.' ORS 137.540(h) and (i).").

The state also points out that the home-visit condition does not actually authorize home visits without a probationer's consent. *See State v. Davis*, 133 Or App 467, 473, 891 P2d 1373, *rev den*, 321 Or 429 (1995) ("Under Article I, section 9, [of the Oregon Constitution] a probation condition that requires a probationer to submit to searches does not constitute a self-executing, prospective consent by the probationer to a general warrantless search. Rather, it represents an agreement by the probationer to submit to reasonable searches by the probation officer. If the probationer refuses to submit to such a search, then the officer has no authority, *under the terms of the search condition*, to conduct a warrantless search. The refusal may, however, violate the terms of the probation and could provide grounds for revocation of the probation." (Emphasis in original; citations omitted.)). The state contends that, because a probationer may refuse to consent to such a visit, the condition does not waive any constitutional rights, and is thus not facially invalid.

As is our usual practice, we consider defendant's state constitutional claims first, and reach her federal constitutional claims only if we conclude that no state constitutional violation occurred. *State v. Newcomb*, 359 Or 756, 764, 375 P3d 434 (2016).

Article I, section 9, provides, in part: "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" For purposes of that provision, a search occurs when government action invades an individual's protected privacy interest. *State v. Tiner*, 340 Or 551, 562, 135 P3d 305 (2006), *cert den*, 549 US 1169 (2007); *see also State v. Campbell*, 306 Or 157, 164, 759 P2d 1040 (1988) ("[T]he privacy protected by Article I, section 9, is not the privacy that one reasonably *expects* but the privacy to which one has a *right*." (Emphasis in original.)). However, Article I, section 9, does not protect against every search or seizure by the government, but only against those that are "arbitrary, oppressive, or otherwise unreasonable." *State v. Barnthouse*, 360 Or 403, 413, 380 P3d 952 (2016) (internal quotation marks omitted).

In *State v. Sanders*, 343 Or 35, 163 P3d 607 (2007), the Oregon Supreme Court considered whether ORS

137.076—a statute requiring the collection of blood or buccal samples from all persons convicted of felonies for purposes of DNA profiling—violates the prohibition against unreasonable searches and seizures in Article I, section 9. The defendant, a convicted felon who had been sentenced to probation, argued that the statute was unconstitutional because it authorized warrantless, suspicionless searches that did not fall within any exception to the warrant requirement. *Id.* at 38-39. In rejecting that argument, the court explained that there exist constitutionally sound reasons to distinguish between suspicionless searches of the general public, and such searches of prisoners, probationers, and other conditional releasees who have been convicted of felonious conduct. *Id.* at 42. The court observed that the first group—which is made up of "presumably law-abiding citizens"—is entitled to all of the rights afforded by the state constitution, whereas the other group—composed of lawfully adjudicated criminals—has engaged in conduct that "substantially heightens the government's interest in identifying and monitoring them." *Id.* at 42-43. The court explained:

> "[P]robationers and other conditional releasees who have been lawfully convicted of a felony do not enjoy the full panoply of rights that the general public possesses. Rather, they are subject to a broad range of restrictions that might infringe on what otherwise would be constitutional rights of a person in a free society. Many such restrictions last only for the duration of the supervision or probation period. For example, probationers and parolees, while they are on probation or parole, often are forbidden to use liquor, to associate with certain people, to travel outside the state, and to change jobs or move without first seeking permission. In addition, at least one permissible restriction on a convicted felon's constitutional rights is permanent, whether that person has been sentenced to a term of imprisonment or to probation: Felony offenders permanently lose their state (and, perhaps, federal) constitutional right to bear arms as a consequence of conviction."

*Id.* at 40-41. Thus, the court held that the requirement in ORS 137.076 that persons convicted of felonies provide a blood or buccal sample does not deprive felony offenders of their constitutional rights under the Oregon Constitution

by subjecting them to a specific search as a consequence of their convictions.[6]

For similar reasons, we reject defendant's contention that the imposition of a probation condition that permits a suspicionless walk-through of a probationer's residence necessarily violates that probationer's rights under Article I, section 9. Probation is a process by which the state imposes rehabilitative and protective conditions upon individuals convicted of crimes, in lieu of depriving them of their liberty through incarceration. *State v. Culbertson*, 29 Or App 363, 369, 563 P2d 1224 (1977), *abrogated on other grounds by Ferguson v. Nelson*, 216 Or App 541, 174 P3d 620 (2007). Implicit in the idea of probation is the assumption that the probationer is more likely than an ordinary citizen to violate the law, and has an even greater incentive to conceal criminal activity due to the threat of facing revocation of probation, and possible incarceration, if apprehended. Moreover, ORS 137.540 vests the trial court with broad discretion in formulating and imposing the appropriate conditions in such cases. In this case, the trial court sentenced defendant to a term of probation as a consequence of her convictions for delivery and possession of methamphetamine. Defendant's status as a probationer permits the government to subject her to numerous restrictions and invasions that would be unlawful if imposed on other, law-abiding citizens.

Furthermore, the condition in ORS 137.540(1)(h) does not give authorities unfettered discretion to search a probationer's home for evidence of criminal activity. We have previously explained that the relationship between a probationer and the probation officer is unlike that of an ordinary citizen and a police officer:

> "We look to the probation officer both as a guidance counselor for his probationer and as a surrogate jailer who must protect the public from a person convicted of crime but allowed conditional liberty. If the probation officer is to perform both functions effectively, his authority to act must be defined more liberally than that of a police officer. The

---

[6] The court also held that requiring convicted felons to submit blood or buccal samples is reasonable under the totality of the circumstances and does not violate the federal constitution. *Sanders*, 343 Or at 44.

> result of a rule restricting a probation officer's supervisory authority to that of a policeman and giving a probationer the same protection of privacy as any other citizen, would be to render probation a less effective penal remedy."

*Culbertson*, 29 Or App at 369. Thus, as with many of the other conditions enumerated in ORS 137.540, the home-visit condition serves a distinct, supervisory function that is separate from, and less invasive than, other purely investigatory searches. Such visits are necessary to effectively promote legitimate state interests in rehabilitating probationers and preventing recidivism. Accordingly, we hold that the general condition of probation in ORS 137.540(1)(h) does not violate Article I, section 9.[7]

Defendant also challenges the home-visit condition under the Fourth Amendment to the United States Constitution, which provides,

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Unlike Article I, section 9, which protects an individual's protected privacy interests, the Fourth Amendment protects an individual's "reasonable expectation of privacy." *Sanders*, 343 Or at 43. Whether a search is reasonable under the Fourth Amendment depends on the totality of the circumstances. *United States v. Knights*, 534 US 112, 118, 122 S Ct 587, 151 L Ed 2d 497 (2001). The reasonableness of a search under the Fourth Amendment is determined "by assessing, on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 118-19 (internal quotation marks omitted).

---

[7] Because we agree with the state's argument that the probation condition is not unconstitutional, we do not discuss the state's alternative argument, that defendant's facial challenge fails because the condition does not authorize home visits without a probationer's permission.

The United States Supreme Court has described probation as "simply one point (or, more accurately, one set of points) on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." *Griffin v. Wisconsin*, 483 US 868, 874, 107 S Ct 3164, 97 L Ed 2d 709 (1987). Moreover, the Court has held that prisoners, parolees, and probationers have significantly diminished expectations of privacy and, consequently, may be deprived of many constitutional rights that ordinary citizens enjoy, including the right to be free from unreasonable searches and seizures. *Sanders*, 343 Or at 43 (so stating); *see also Knights*, 534 US at 119 ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled. Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." (Internal quotation marks and citations omitted.)); *Griffin*, 483 US at 873-74 ("A state's operation of a probation system * * * presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements.").

The closest the Supreme Court has come to ruling on the constitutionality of a probation condition such as the one at issue here was in *Samson v. California*, 547 US 843, 126 S Ct 2193, 165 L Ed 2d 250 (2006). At issue in that case was a California law that required every prisoner eligible for parole to "agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause." *Id.* at 846 (internal quotation marks omitted). Applying the totality of circumstances approach, the Court held that suspicionless searches of parolees did not violate the Fourth Amendment. The Court observed that parolees—who, like probationers are on the "continuum" of state-imposed punishments—have even fewer expectations of privacy than probationers, and are subject to a number of conditions that demonstrate their "severely diminished expectations of privacy by virtue of their status alone." *Id.* at 850-52. The Court concluded that, based on the petitioner's

status as a parolee, and in light of the plain terms of the parole search condition, "petitioner did not have an expectation of privacy that society would recognize as legitimate." *Id.* at 852. Conversely, the Court observed that the state's interests in "reducing recidivism and * * * promoting reintegration and positive citizenship among probationers and parolees" are substantial, warranting privacy intrusions that would not otherwise be tolerated under the Fourth Amendment. *Id.* at 853. The Court held that the Fourth Amendment did not prohibit states from addressing such concerns effectively through the administration of suspicionless searches of parolees. *Id.* at 854.

The conclusion in *Samson* that the Fourth Amendment does not prohibit suspicionless searches of parolees is instructive here. Unlike the condition in *Samson*, the challenged condition here requires only that a probationer permit the probation officer "to visit the probationer or the probationer's work site or residence and to conduct a walkthrough of the common areas and of the rooms in the residence occupied by or under the control of the probationer." ORS 137.540(1)(h). On its face, that condition is significantly more limited than, and does not purport to authorize, the type of search that was authorized by California law in *Samson. Samson*, 547 US at 846 (allowing "search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause"). We are cognizant of the distinction drawn by the Court in *Samson* between probationers and parolees, and the fact that *Samson* involved a parolee, not a probationer. The Indiana Supreme Court has recently provided a cogent explanation of why that distinction does not compel a different result in the context of a suspicionless search of a probationer:

"[T]he similarities between parole and probation * * * are far greater than the differences. Both involve the conditional release from custody, subject to terms of compliance the violation of which can terminate release and return an individual to serve the sentence imposed. Both serve humane and restorative objectives that support their utilization. In both, a decision to place a defendant on such a conditional release program is predictably unlikely when

the enforcement of the conditions of release is uncertain or procedurally difficult. And despite the differences on the continuum of personal liberty, we nevertheless find that parolees and probationers both share equivalent understandings that their freedom from incarceration is conditional and subject to monitoring.

"Because probation, like parole, involves the conditional release of a prisoner who would otherwise be subject to unrestricted searches during his or her incarceration, because neither probationers nor parolees enjoy the absolute liberty to which other citizens are entitled, because probation searches are necessary to the promotion of legitimate government interests, because the willingness of judicial officers to grant conditional release is likely to be impaired if supervision is uncertain or difficult, and because searches of probationers * * * require that they be unambiguously informed of a clearly expressed search condition in the conditions of release to probation or community corrections, we conclude that the holding in *Samson* is applicable to probationers[.]"

*State v. Vanderkolk*, 32 NE3d 775, 779 (Ind 2015). We find that reasoning persuasive and conclude that, on balance, the state's interests in operating an effective probation system outweigh a probationer's independent interest in being free from intrusions into his or her privacy as contemplated by the home-visit condition in ORS 137.540(1)(h). Accordingly, we hold that that condition is reasonable under the totality of the circumstances and, thus, does not violate the Fourth Amendment's prohibition against unreasonable searches and seizures.

Affirmed.